MATTHEW A. LESNICK (SBN 177594)
    matt@lesnickprince.com
LAUREN N. GANS (SBN 247542)
    lgans@lesnickprince.com
LISA R. PATEL (SBN 341574)
    lpatel@lesnickprince.com
LESNICK PRINCE & PAPPAS LLP
315 W. Ninth Street, Suite 705
Los Angeles, CA  90015
Telephone:  (213) 493-6496
Facsimile:   (213) 493-6596

Proposed Attorneys for Debtor in Possession
Capital KCS, LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. 2:23-bk-13029-DS |
| | Chapter 11 |
| CAPITAL KCS, LLC | **DECLARATION OF KEVIN J. CHEN IN SUPPORT OF DEBTOR'S FIRST-DAY MOTIONS** |
| Debtor in Possession. | [Hearing to be set by Court] |

I, Kevin J. Chen, declare as follows:

1.      I am a Managing Member of Capital KCS, LLC, the debtor and debtor in possession in the above-captioned bankruptcy case (the "Debtor"). Unless otherwise stated, I have personal knowledge of the facts set forth in this declaration and, if called as a witness, could and would competently testify as to these facts.

### Personal Background

2.      I have extensive experience in both fashion and real estate. I received my undergraduate degree from the Fashion Institute of Technology in New York. I also

attended the Executive Program at the Harvard Graduate School of Design, with a focus on real estate.

3.    I have 30 years of professional experience in the fashion and creative industries, including both retail and design and have worked with major fashion brands such as Gianni Versace, Giorgio Armani, and Brioni. I have founded, run and owned multiple successful companies in the fashion industry.

4.    I also have 20 years of professional experience in the real estate industry, including investing in multiple properties in the Los Angeles area. In addition, I am the CEO of Arts District Development [https://www.artsdistrictcenter.com], a real estate development and investment firm I formed in 2014 to invest in and promote real estate development and promote the arts and culture in the Arts District of Downtown Los Angeles.

**The Debtor, the Property, and the ADC Project**

5.    The Debtor is a California limited liability company owned 100% by me and my wife, Cynthia Chen.

6.    In July 2008, the Debtor purchased a two-story, 91,200 square foot loft and commercial building in the Arts District of Los Angeles on a 1.05-acre lot (the "Property") with the intention of making it into a space for creative individuals to live and work. The primary address of the Property is 459 Colyton Street, Los Angeles, California 90013. The original purchase price of the Property was $6.6 million. A third-party appraiser commissioned by secured creditor East West Bank valued the Property at $60.9 million in as-is condition as of January 2023.  A true and correct copy of the appraisal is attached hereto as Exhibit A.

7.    At the time of the purchase, the global financial market was in extreme distress, and the area surrounding the Property, which was adjacent to Skid Row, was considered to be unsafe. However, I saw its potential to be an artistic hub, envisioning it to be the Los Angeles equivalent of New York's Chelsea or Meat Packing District neighborhoods.

8.      After acquiring the Property, I made significant investments to revitalize it, ensuring it was brought up to code and provided a safe environment for artists to thrive. The Property then served as a creative office space, a warehouse, and an artist-in-residence live/work space.

9.      In 2012, I conceptualized turning the Property into a much larger mixed-use development called Arts District Center which would include artist residences, an art hotel, an art gallery and exhibition space, commercial space, and wellness facilities ("ADC" or the "Project"). I envisioned Arts District Center as an artistic ecosystem that fosters a sense of community within the neighborhood. Additional information about the ADC can be found on its web site: https://www.artsdistrictcenter.com

10.     The Project contemplates replacing the existing two-story structure with a new, larger building consisting of 562,000 usable square feet of space, including a 113-room hotel, high-end 129 residential units, 110,000 square feet of retail, dining and amenity space, and extensive public art spaces in a LEED-Gold certified building designed by the same renowned architectural firm that designed the Wilshire Grand Center in DTLA.

11.     The Property was not initially zoned for such mixed-use development, so I initiated a campaign to garner support for the Project, engaging with over 300 stakeholders, residents, artists, and non-profit organizations. In 2016, the City adopted an ordinance to change the Art District's zoning, but the ordinance faced litigation, resulting in its termination. Despite the significant time and resources invested, the Project did not progress as planned.

12.     In Summer 2016, the City began accepting zoning entitlement applications for new developments in the Arts District. After a five-year wait (2012-2016), ADC's entitlement application was accepted by the City in November 2016. I led the architect and consultant teams in preparing an Environmental Impact Report ("EIR") and managing all entitlement aspects from 2016 to 2020.

13.     ADC received full entitlement in February 2020, shortly before the COVID-19 pandemic and resulting lockdowns. Despite the challenges COVID-19 posed, the Project continued to progress due to the assistance of various consultant teams that worked on pre-construction plans and coordinated with the City's planning department and the Los Angeles Department of Building and Safety ("LADBS"). As the principal of the Project, I closely collaborate with a team of approximately 100 consultants, including architects, engineers, surveyors, labor unions and legal professionals, among others. I oversee various aspects of the Project, starting from design and coordinating construction drawings, to selecting construction companies, marketing, financing, and orchestrating each process of the development meticulously.

14.     In order to obtain a demolition permit, the Los Angeles Housing Authority required all tenants at the Property to relocate. Most tenants agreed to move out by the end of 2020, and the remaining tenants vacated the building in May 2021 after receiving relocation settlements.

15.     By the summer of 2021, the Project reached the final round of design, with 75% of the construction drawings completed, and all of the Parallel Design-Permitting Process fees paid to LADBS. The demolition permit was received at the end of 2021.

16.     As a result of having to relocate the tenants, the Property has generated almost no rental income since January 2021.

### Current Debt

17.     Entitlements and environmental reviews are challenging and time-consuming processes. Due to the uncertainty of approval timelines, I decided not to bring in investors. Instead, I obtained three loans for the Debtor: two loans from East West Bank ("EWB") in 2011 and 2017; and a bridge loan from CPIF California, LLC ("CPIF") in 2019. These loans were intended to cover consultant fees, city fees for the entitlement process, and preconstruction development costs, with the ultimate goal of securing a construction loan to repay these creditors.

4

18.    EWB is currently owed approximately $8.6 million, secured by first and second-position deeds of trust on the Property.

19.    CPIF is owed approximately $15.5 million, secured by a third-position deed of trust on the property as well as a lien on substantially all of the Debtor's personal property and intangibles.

20.    Accordingly, the Debtor has approximately $24 million in secured debt against a property worth more than $60 million. The Debtor has very little unsecured debt.

### Reasons for Filing Bankruptcy

21.    In February 2020, the Debtor entered into a term sheet for a $180 million construction loan from Bluebell International LLC ("Bluebell"), a commercial real estate lender specializing in large construction projects, including everything from pro sports stadiums to commercial and retail projects, power plants, hospitality, and city infrastructure. Under the belief that I had secured a $180 million construction loan for the Debtor, I commenced preconstruction development, including drawing preparations, permit applications, and negotiations with prospective tenants.

22.    Unfortunately, Bluebell closed down in 2021. However, Bluebell reissued a revised commitment to the Project in March 2022 through Boston Investment Groups, LLC ("BIG"), another lender/investor specializing in large construction projects.

23.    In January 2022, the Debtor also received a term sheet for an $80 million mezzanine loan from PACE Equity, LLC ("PACE"), a leader in Commercial Property Assessed Clean Energy ("CPACE"). PACE specializes in funding development projects with lower energy impacts and water consumption.

24.    Ultimately, the BIG and PACE loan proposals did not close because, among other reasons, each company wanted the other loan to close first, and BIG refused to verify its funding.

25.    As work on the Project progressed, the Debtor's funds became depleted, and thus I sought to finalize the construction loan and CPACE financing for the Project.

26.    In April 2022, due to the delay in securing financing, I engaged broker Michael Long of Long Financial Services, Inc. to help obtain private equity financing. Mr. Long introduced me to Pamela Thilavannh of PEJ Holdings, LLC, who expressed interest in investing $45 million in the Project. This amount would have enabled the Debtor to pay off its existing debt, start the demolition, and secure a construction loan.

27.    In June 2022, the Debtor paid Thilavannh a $25,000 due diligence fee. Unfortunately, after five months of delay and unfruitful results, Thilavannh threatened to sue if the Debtor requested the return of the $25,000 deposit.

28.    Subsequently, Long introduced me to Urban Bay Financial, LLC ("Urban Bay") to refinance $30 million for the Property. I paid Urban Bay a $33,000 due diligence fee in October 2022, but Urban Bay failed to close the refinance and retained the deposit.

29.    CPIF's loan carried a high interest rate of 11.5% in 2019, which later increased to 16.5%. The CPIF loan was a bridge loan originally scheduled to mature on March 18, 2021. The Debtor believed that this would be sufficient time to secure construction financing and pay off CPIF. However, because of the delays and problems described above, the Debtor instead has paid for CPIF for three loan extensions, as follows: (1) an extension from March 18, 2021 to October 1, 2021 for a fee of $1 million; (2) an extension from October 1, 2021 to April 1, 2022 for a fee of $1,278,272.38; and (3) an extension from April 1, 2022 to October 1, 2022 for $1,166,872.85. The Debtor also entered into a forbearance agreement with CPIF on March 15, 2023 for an additional $300,000.

30.    On May 11, 2023, I initiated communication with CPIF to request a 90-day extension for the purpose of refinancing the loan. The Debtor signed a pre-negotiation agreement with CPIF on May 12, 2023.

31.    On May 17, 2023, CPIF emailed me stating that they did not agree to any further extensions and would not postpone the foreclosure sale. CPIF's non-judicial foreclosure sale was scheduled for May 17, 2023 at 11:00 a.m. Given the extremely short notice, the Debtor filed an emergency voluntary petition for relief under chapter 11 of the Bankruptcy Code to protect the Property and the Project. Indeed, CPIF pulled the plug on the extension so soon before the foreclosure sale that I was forced to file the petition myself in person at the Bankruptcy Court without counsel.

32.    As of the Petition Date, the interest and fees paid on the $15.5 million CPIF loan amount is $7,687,253.13.

33.    Meanwhile, EWB increased the loan interest rate from 5% to 9.75%.

### Plans for Exiting Bankruptcy

34.    Despite the challenging economic conditions caused by rising interest rates, I am actively seeking other financing options from several well-known lenders. Given the massive amount of equity in the Property, I believe that the Debtor will be able to refinance the existing debt.

35.    However, in order to make it even easier to obtain replacement financing, I intend to increase the Debtor's monthly cash flow by leasing the Property again and engaging in joint ventures with other businesses. The Debtor already has one small tenant paying a little more than $5,000 per month, and the Debtor is in serious discussions for a large commercial operator that would generate well over $100,000 per month in rent or joint venture income for the Debtor. With that amount of cash flow, I believe the Debtor will quickly be able to refinance its debt in full and exit bankruptcy. Once creditors are paid in full and the Debtor is out of bankruptcy, it can resume its efforts to obtain construction financing or investments to complete the Project.

### First Day Motions

36.    In order to operate in chapter 11 and comply with its requirements under the Bankruptcy Code and other applicable rules, the Debtor is filing certain "First Day

Motions" concurrently with this declaration. (The Debtor recognizes that it is long past the first day of the case.)

### No Need to Use Cash Collateral

37.    The Debtor is not filing a cash collateral motion because it does not need to use any cash collateral. As of the Petition Date, the Debtor had $13,317.41 in its bank account (the "Petition Date Cash"). Although the Debtor is not conceding that the Petition Date Cash is the cash collateral of either EWB or CPIF, in order to keep this case as simple and streamlined as possible, the Debtor intends to not use any of the Petition Date Cash to pay any post-petition operating expenses. Instead, the Debtor will fund its operating expenses through a combination of (a) money contributed by me and my wife, and (b) post-petition revenues.

### No Need for Employee Payroll Motion

38.    The Debtor also is not filing a motion to approve payment of any prepetition employee payroll because it does not have any employees on its payroll. To the extent the Debtor has any "employees" that perform work for the Debtor's benefit, such employees are paid their full salaries and wages by one of my other entities. In other words, any payroll obligations are non-Debtor obligations. In essence, the services of these employees are an in-kind capital contribution from me and my wife.

### Utilities Motion

39.    The Debtor is filing a motion to fix the amount of security deposits for its utilities under Bankruptcy Code § 366. Listed below are the names of the utility companies that are currently providing utility services to the Debtor, the type of utility services provided, the account numbers with the utility company, and the amount of the cash deposit proposed to be paid to each utility company as adequate assurance of payment:

| Utility Company | Service/Service Address | Account No. | Proposed Cash Deposit |
|---|---|---|---|
| LADWP | Electric – 450 Seaton St., Los Angeles, CA | 408 681 0000 | $64.51 |

| Utility Company | Service/Service Address | Account No. | Proposed Cash Deposit |
|---|---|---|---|
| | 90013 | | |
| LADWP | Electric – 454 Seaton St., Los Angeles, CA 90013 | 508 681 0000 | $1,295.72 |
| LADWP | Electric – 1101 E 5th St., Los Angeles, CA 90013 | 608 681 0000 | $80.04 |
| LADWP | Electric / Water & Sewer – 451 Colyton St., Los Angeles, CA 90013 | 208 681 0000 | $220.45 |
| LADWP | Electric – 453 Colyton St., Los Angeles, CA 90013 | 308 681 0000 | $486.03 |
| SoCalGas | Gas – 1129 E 5th St. # 3, Los Angeles, CA 90013 | 144 100 2027 6 | $4.96 |
| SoCalGas | Gas – 1129 E 5th St. # 8, Los Angeles, CA 90013 | 137 800 2045 2 | $4.96 |
| SoCalGas | Gas – 1129 E 5th St. # 9, Los Angeles, CA 90013 | 131 500 2041 3 | $4.96 |
| SoCalGas | Gas – 1129 E 5th St. # 6, Los Angeles, CA 90013 | 146 200 2003 3 | $7.03 |
| Spectrum | Internet – 1131 E 5th St., Los Angeles, CA 90013 | 8448 30 033 0507788 | $199.99 |
| AT&T | Internet / Phone – 1129 E 5th St., Los Angeles, CA 90013 | 117391421 | $98.32 |

40.    The proposed cash deposits listed in the table above for each utility company represent the Debtor's average monthly invoice amount over the last three months for that particular utility.

41.    Given the importance of the services provided by the utility companies to the continued operation of the Debtor's business, it is crucial that the Debtor provide adequate assurance to the utility companies so that there is no interruption in the services provided.

42.     The source of the funds to be used to pay the proposed cash deposits to the utility companies will be either the Debtor's cash on hand in excess of the Petition Date Cash and/or payments directly from me or one of my other entities, which will be treated as a capital contribution to the Debtor. In addition to the cash deposits, the utility companies will be kept current on all post-petition amounts payable in the same manner.

**Extension of Time To File Schedules and Statement of Financial Affairs**

43.     Since the Petition Date, my primary focus was locating and retaining counsel to represent the Debtor in the bankruptcy case. The Debtor formally retained Lesnick Prince & Pappas LLP on May 25, 2023, subject to the Court's approval. Since then, the Debtor has begun working to compile and analyze information needed to complete the Schedules and Statement of Financial Affairs (together, "Schedules"). The Debtor needs additional time to compile and complete the Schedules accurately. Although the Debtor is not a large company, the deadline for filing the Schedules is in only a few days.  At the same time, the company has only a few employees sufficiently familiar with the books and records to prepare the Schedules and address the company's business and financial issues. I believe that the Debtor will need a 21-day extension to prepare its Schedules accurately and completely.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 30, 2023 at _____ _____**Los Angeles**_____, California.

_____

Kevin J. Chen

# EXHIBIT A

# APPRAISAL REPORT

# OF ENTITLED LAND



*Located at:*

459 Colyton Street
Los Angeles, California 90013

**File#: 20690**

**A-CORE File No. 22165**

*Date of Value:*

"As Is" Market Value – January 17, 2023

*Date of Report:*

January 26, 2023

*Prepared for:*



*Prepared by:*



*APPRAISAL REPORT*

*ENTITLED LAND*

_____

*LOS ANGELES, CALIFORNIA*

*Located At:*

459 Colyton Street
Los Angeles, California 90013

**File#: 20690**

**A-CORE File No. 22165**

*Date of Value:*

"As Is" Market Value – January 17, 2023

*Date of Report:*

January 26, 2023

*Prepared For:*

**EAST WEST BANK**
Mr. Ernie Lopez, MAI
SVP, Chief Appraiser
228 W. Garvey Ave.
Monterey Park, California 91754

*Prepared By:*

**A-CORE CONSULTANTS, INC.**
20555 Devonshire Street, Suite 200
Chatsworth, California 91311

**A-CORE** CONSULTANTS, INC.
*APPRAISAL • CORPORATE REAL ESTATE SERVICES*

January 26, 2023

**EAST WEST BANK**
Mr. Ernie Lopez, MAI
SVP, Chief Appraiser
228 W. Garvey Ave.
Monterey Park, California 91754

RE:     Commercial Building
        459 Colyton Street
        Los Angeles, California 90013
        File#: 20690

Dear Mr. Lopez:

Pursuant to your request, we have prepared an appraisal report of the above referenced property. The subject property is located on the north side of 5th Street between Colyton Street and Seaton Street, in the City and County of Los Angeles, California.

The subject consists of one, two-story commercial building that has mixed construction consisting of brick, block and wood frame. The building has been seismically retrofitted and contains 91,200± gross/rentable square feet. The net rentable area per the rent roll is in direct correlation with the appraiser's measurements and the assessor's building size of 91,200 square feet. The existing improvement was built circa 1908, and is in average condition. Originally built for industrial use, this property is located in the "Arts District" of Los Angeles, and has been converted to commercial use on the ground floor and live work/creative office space upstairs. The owners have received entitlements (Exhibit D) for a mixed-use development consisting of 129 live/work condo units, 113-room hotel and 81,326 square feet of commercial space. The entitlements reflect a total building area of 370,340 square feet and results in an FAR of 8.1 to 1, which is much higher than current ratio of 2 to 1 for the existing improvements. The highest and best use analysis suggests that the subject should be demolished in lieu of the proposed mixed-use development that will maximize the utility of the site. It is important to note that the owners have received a demolition permit (20019-1000-03834) on October 17, 2022.

Based on the age/condition and entitlements, the subject does not have any remaining economic life. As of the date of value, the subject is 100% vacant according to Mr. Kevin Chen. During our inspection Unit 451 (Admere Liquidations) was occupying their space. It was further stated by Mr. Chen that the tenant is in the process of selling or removing the remaining merchandise. The improvements are constructed on a site that encompasses 45,721± SF or 1.05± acres.

At the request of the client, **EAST WEST BANK**, the accompanying appraisal will present the following market value estimates:

1.)     "As Is" Market Value
2.)     Insurable Value

Mr. Lopez                                                                                January 26, 2023
**EAST WEST BANK**                                                                             Page 2

The subject property was last inspected on January 17, 2023 and is appraised as of that date. The report has been prepared in accordance with Standard Rule 2-2(a) of the Uniform Standards of Professional Appraisal Practice (USPAP 2020-2023) as promulgated by the Appraisal Standards Board of the Appraisal foundation and the Appraisal Institute and is in conformity with current Interagency Appraisal and Evaluation Guidelines dated 12/02/2010.  **Your attention is directed to the attached Basic Assumptions, Limiting Conditions, Hypothetical Conditions, and Extraordinary Assumptions on page 3 of this appraisal report for further conditions of the valuation.**

The accompanying appraisal report is intended for the client, **EAST WEST BANK**, and other authorized individuals.  It may be used for potential loan underwriting or portfolio monitoring purposes.  It may also be used in connection with the acquisition, disposition, and financing of the sale of the property.  Any recipient of this report, other than our client, may only rely on the "as is" market value conclusion presented in this appraisal.

An inspection has been made of the subject property and its surrounding area.  All relevant data pertaining thereto has been analyzed and incorporated into the following pages and exhibits.  The value rendered herein is subject to the assumptions detailed throughout the report.

Based upon the analysis of the data presented, it is the opinion of the appraiser that the "As Is" market value of the fee simple interest in the subject property as of January 17, 2023 is: *$60,900,000.*

| **SIXTY MILLION NINE HUNDRED THOUSAND DOLLARS** |
|---|

**Insurable Value:**                           **$9,560,000**

Respectfully submitted,

**A-CORE CONSULTANTS, INC.**

John Olivas, MAI
CA BREA No. AG015884
Expires 12/04/2023

## TABLE OF CONTENTS

Title Page
Letter of Transmittal
Table of Contents
Certification
Photographs of the Subject Property

## PREMISES OF THE APPRAISAL

Summary of Important Conclusions ................................................................................. 1
Statement of Basic Assumptions and Limiting Conditions ............................................. 3
Identification of the Subject Property ............................................................................. 6
Prior Property Association.............................................................................................. 6
Scope of the Appraisal ................................................................................................... 6
Definition of Significant Terms ..................................................................................... 8
Purpose of the Appraisal ............................................................................................... 8
Intended Use and User of the Report ............................................................................ 8
Property Rights Appraised ............................................................................................. 9
Significant Dates ........................................................................................................... 9
Definition of Market Value ........................................................................................... 9
History of the Property ................................................................................................ 10
Occupancy and Use..................................................................................................... 10

## PRESENTATION OF DATA

Area Economic Analysis .............................................................................................. 11
Apartment Market Overview ....................................................................................... 20
Retail Market Overview .............................................................................................. 23
Hospitality Market Overview ...................................................................................... 26
Marketing and Exposure Time .................................................................................... 28
Zoning ......................................................................................................................... 29
Assessed Value and Taxes ........................................................................................... 31
Site Description ........................................................................................................... 32
Description of the Improvements ................................................................................ 36
Highest and Best Use .................................................................................................. 38

## VALUATION PROCESS

Valuation Process ........................................................................................................ 42
Sales Comparison Approach ........................................................................................ 43
Final Value Conclusion ............................................................................................... 52

## ADDENDA

Exhibit A:      Excerpts from Title Report/ParcelQuest Profile
Exhibit B:      Excerpts of Determination Letter
Exhibit C:      Required Bank Forms
Exhibit D:      Engagement Letter
Exhibit E:      Qualifications of the Appraiser

## CERTIFICATION

*I certify that, to the best of my knowledge and belief:*

–    The statements of fact contained in this report are true and correct.

–    The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions, and conclusions.

–    I have no present or prospective interest in the property that is the subject of this report and no personal interest with respect to the parties involved.

–    I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

–    My engagement in this assignment was not contingent upon developing or reporting predetermined results.

–    My compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

–    I have performed a previous appraisal of the subject property within the three years immediately preceding the acceptance of this appraisal assignment.  A previous appraisal was prepared for **EAST WEST BANK**, and the effective date of value was May 22, 2021 with a date of report of June 14, 2021.  Other than the previous appraisal, the appraiser has had no other association with either the subject property or its owner.

–    The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics & Standards of Professional Appraisal Practice of the Appraisal Institute.

–    The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

–    The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

–    John Olivas has made a personal inspection of the property that is the subject of this report.

–    No one provided significant real property appraisal assistance to the person signing this certification.

–    As of the date of this report, John Olivas, MAI has completed the continuing education program for Designated Members of the Appraisal Institute.

Respectfully submitted,

**A-CORE CONSULTANTS, INC.**

John Olivas, MAI
CA BREA No. AG015884
(Exp. 12/04/23)

**PHOTOGRAPHS OF SUBJECT PROPERTY**







**East elevation from intersection of E. 5th St. & Colyton St.**

**West elevation from Seaton Street**

**South elevation from E. 5th Street looking west**

**South elevation from E. 5th Street looking east**

**PHOTOGRAPHS OF SUBJECT PROPERTY**



**West elevation looking south**



**Southeast elevation from intersection of E. 5th St. & Colyton St.**



**East elevation from Colyton Street**



**Ground floor commercial space – 1129 E. 5th Street(owner space)**

**PHOTOGRAPHS OF SUBJECT PROPERTY**



**Ground floor commercial space – 1129 E. 5th Street**



**Wood truss ceiling - 1129 E. 5th Street**



**Ground floor commercial space – 1129 E. 5th Street (owner space)**



**View of a 2nd floor live/work unit (furniture left by former tenants)**

PHOTOGRAPHS OF SUBJECT PROPERTY



**Another view of a 2ⁿᵈ floor live/work unit (furniture left by former tenants)**



**Another view of a 2ⁿᵈ floor live/work unit**



**Another view of a 2ⁿᵈ floor live/work unit**



**Stairs to loft in 2ⁿᵈ floor live/work unit**

# STREET SCENES



**Northbound Colyton Street**



**Southbound Colyton Street**



**Eastbound E. 5th Street**



**Westbound E. 5th Street**

# STREET SCENES



**Northbound Seaton Street**



**Southbound Seaton Street**

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**                                                                                *1*

## SUMMARY OF IMPORTANT CONCLUSIONS

| | |
|---|---|
| Location of Property: | North side of 5th Street between Colyton Street and Seaton Street, in the City and County of Los Angeles, California |
| Property Address: | 459 Colyton Street<br>Los Angeles, CA 90013 |
| Property Status: | Entitled Land.  Existing improvements to be razed in favor of proposed mixed-use development. |

References:
  Assessor's Parcel Number:     5163-025-009
  Census Tract No.:             2060.31
  TBG Guide (Page/Grid):        634/G5 (Los Angeles County)
  Property Ownership:           Capital KCS LLC

Building Improvements:
  Gross/Net Rentable Area (SF): 91,200± SF
  Occupancy:                    0.0%
  Year Built:                   1908
  Actual Age:                   115 years
  Economic Life:                60 years
  Effective Age:                60 years
  Remaining Economic Life:      0 years
  Construction Type:            Mixed - brick, block and wood frame
  Building Class:               C
  Quality/Condition:            Average/Average
  Parking:                      None

Site Description:
  Total Site Area:              45,721± SF or 1.05± acres
  Shape:                        Rectangular
  Zoning:                       C2-2, M3-1 -RIO, City of Los Angeles
  Case Number:                  CPC-2016-4475-GPA-VZC-HD-MCUP-CUX-DB-SPR
  Easements:                    No Atypical Easements
  Alquist-Priolo Fault Zone:    No
  Flood Zone:                   Community Map/Panel No. 06037C-1636G dated December 21, 2018.  The subject site is located within Flood Zone X.  Zone X is an area of minimal flood hazard, where flood insurance is not typically required.

Highest and Best Use:
  As Vacant:                    Mixed-use project consisting of 129 live/work condo units, 113-room hotel and 81,326 square feet of commercial space
  As Improved:                  Raze existing structure in favor of the proposed mixed-use project consisting of 129 live/work condo units, 113-room hotel and 81,326 square feet of commercial space

Property Rights Appraised:      Fee Simple Estate

Most Probable Buyer:            Institutional investor/developer

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**

*2*

## SUMMARY OF IMPORTANT CONCLUSIONS

Significant Dates:

| | |
|---|---|
| Date of Inspection: | January 17, 2023 |
| "As Is" Date of Value: | January 17, 2023 |
| Date of Report: | January 26, 2023 |

**FACTORS INFLUENCING VALUE:**

| **Sale Comparison Approach**: | Range |
|---|---|
| Sale Price Per SF of FAR Unadjusted: | $65.61 - $332.82 |
| Price Per SF of FAR (Adjusted): | $134.48 - $511.01 |
| Conclusion: | $167.50 |

**VALUATION INDICATORS**

| | "As Is" |
|---|---|
| Cost Approach: | N/A |
| Income Approach: | N/A |
| Sales Approach: | $60,900,000 |
| **Final Value Conclusion:** | **$60,900,000** |
| **Insurable Value:** | **$9,560,000** |
| Estimated Marketing Time | 6 to 9 months |

**459 COLYTON STREET**                                                        *3*
**LOS ANGELES, CALIFORNIA**

---

### STATEMENT OF BASIC ASSUMPTIONS AND LIMITING CONDITIONS

*This Appraisal Report is subject to underlying assumptions and limiting conditions qualifying the information contained in the Report as follows:*

The valuation estimate and market or feasibility conclusions apply only to the property specifically identified and described in the ensuing report.

No responsibility is assumed for the legal description or for matters including legal or title considerations. Title to the property is assumed to be good and marketable unless otherwise stated.

It is assumed that all information known to the client and relative to the valuation has been accurately furnished and that there are no undisclosed leases, agreements, liens, or encumbrances affecting the use of the property.

The property is appraised free and clear of any or all liens or encumbrances unless otherwise stated.

Responsible ownership and competent property management are assumed.

The information furnished by others is believed reliable. However, no warranty is given for its accuracy.

It is assumed that there are no hidden or unapparent conditions of the property, subsoil, or structures that render it more or less valuable. No responsibility is assumed for such conditions or for arranging for engineering studies that may be required to discover them.

It is assumed that there is full compliance with all applicable federal, state, and local environmental regulations and laws unless noncompliance is stated, defined, and considered in the appraisal report.

It is assumed that all applicable zoning and use regulations and restrictions have been complied with, unless nonconformity has been stated, defined, and considered in the appraisal report.

It is assumed that all required licenses, certificates of occupancy, consents, or other legislative or administrative authority from any local, state, or national government or private entity or organization have been or can be obtained or renewed for any use on which the value estimate contained in this report is based.

It is assumed that the utilization of the land and current improvements is within the boundaries or property lines of the property described and that there is no encroachment or trespass unless noted in the report.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**                                                                           *4*

### STATEMENT OF BASIC ASSUMPTIONS AND LIMITING CONDITIONS

The appraisal is based on the condition of the local and national economies, purchasing power of money, and financing rates prevailing at the effective date of appraisal.

The appraiser, by reason of this appraisal, is not required to give further consultation, testimony, or be in attendance in court with reference to the property in question unless arrangements have been previously made.

Neither all nor any part of the contents of this report shall be disseminated to the public through advertising, public relations, news, sales, or other media without prior written consent and approval of the appraisers.

Disclosure of the contents of this appraisal report is governed by the By-Laws and Regulations of the Appraisal Institute. Additionally, the report has been prepared with the intention of conforming with the Real Estate Regulations imposed by the "FIRREA" of 1989.

All values rendered within this report assume marketing times of twelve months or less, unless otherwise indicated.

Unless otherwise stated in this report, the existence of hazardous substances, including without limitation asbestos, polychlorinated biphenyl's, petroleum leakage, or agricultural chemicals, which may or may not be present on the property, or other environmental conditions, were not called to the attention of nor did the appraiser becomes aware of such during the appraiser's inspection. The appraisers have no knowledge of the existence of such materials on or in the property unless otherwise stated.

The appraiser, however, is not qualified to test such substances or conditions. If the presence of such substances, such as asbestos, urea formaldehyde foam insulation, or other hazardous substances or environmental conditions, may affect the value of the property, the value is predicated on the assumption that there is no such condition on or in the property or in such proximity thereto that it would cause a loss in value. No responsibility is assumed for any such conditions, nor for any expertise or engineering knowledge required to discover them. The client is urged to retain an expert in this field, if desired.

Possession of this report, or a copy thereof, does not carry with it the right of publication.

The Americans with Disabilities Act ("ADA") became effective January 26, 1992. The proposed units are believed to comply with ADA requirements.

**459 COLYTON STREET**                                                                                                        *5*
**LOS ANGELES, CALIFORNIA**

## STATEMENT OF BASIC ASSUMPTIONS AND LIMITING CONDITIONS

The Appraisal Institute conducts a program of continuing professional education for its designated members. Members (MAI and SRA) who meet minimum standards of this program are awarded periodic education certification.

As of the date of this report, I, John Olivas, MAI, have completed the requirements under the continuing education program of the Appraisal Institute. I am also certified by the State of California through December 4, 2023 (BREA Appraiser's Identification Number AG015884).

## HYPOTHETICAL CONDITIONS

None.

## EXTRAORDINARY ASSUMPTIONS

As of the date of value, the subject is 100% vacant according to Mr. Kevin Chen. Although there was a tenant in Unit 451 (Admere Liquidations) still temporarily occupying their space, the appraiser assumes the subject will be vacant prior to the start of demolition. Reliance of this assumption may affect the assignment results.

The appraiser requested an updated preliminary title report but it was not provided. The appraiser relied on a preliminary title report prepared by Stewart Title Company dated August 18, 2014 that was provided for the previous appraisal that was completed in September 2018. The appraiser assumes that there have not been any significant changes to the preliminary title report since the last appraisal. The appraiser also assumes that the subject is free of any adverse easements, encroachments, or other factors that would affect the marketability of the property. Reliance of this assumption may affect the assignment results.

459 COLYTON STREET                                                                          *6*
LOS ANGELES, CALIFORNIA

## IDENTIFICATION OF THE SUBJECT PROPERTY

Property Type:                Two story commercial building

Location of Property:         North side of 5th Street between Colyton Street and Seaton
                              Street, in the City and County of Los Angeles, California

Property Status:              Entitled Land.  Existing improvements to be razed in favor
                              of proposed mixed-use development.

Property Address:             459 Colyton Street
                              Los Angeles, CA 90013

References:
  Assessor's Parcel Number:   5163-025-009
  Census Tract No.:           2060.31
  TBG Guide (Page/Grid):      634/G5 (Los Angeles County)
  Property Ownership:         Capital KCS LLC

Building Improvements:
  Gross/Net Rentable Area (SF):  91,200± SF
  Occupancy:                  0.0%
  Year Built:                 1908
  Actual Age:                 115 years

Site Description:
  Total Site Area:            45,721± SF or 1.05± acres
  Shape:                      Rectangular
  Zoning:                     C2-2, M3-1 -RIO, City of Los Angeles
  Case Number:                CPC-2016-4475-GPA-VZC-HD-MCUP-CUX-DB-SPR

  Legal Description:          Please See Addenda

## PRIOR PROPERTY ASSOCIATION

I have performed a previous appraisal of the subject property within the three years immediately
preceding the acceptance of this appraisal assignment.  A previous appraisal was prepared for **EAST
WEST BANK**, and the effective date of value was May 22, 2021 with a date of report of June 14,
2021.  Other than the previous appraisal, the appraiser has had no other association with either the
subject property or its owner.

## SCOPE OF THE APPRAISAL

The scope of the analysis includes the gathering of market data and the analysis thereof to assist
in developing an opinion of value for the subject property.  Information was obtained through
such sources as selling and leasing brokers, public records, developers, investors, and the client.
From the indications presented in the market, the appraiser will then conclude to a value of the
fee simple interest of the subject property.

### *Data Collection*

*General Data*: The social, economic, governmental and environmental data related to the region,
city and neighborhood was obtained from various public sources.  These sources included the
local chamber of commerce.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**                                                7

## SCOPE OF THE APPRAISAL

### *Data Collection (Continued)*

The flood information was obtained from the National Flood Insurance Program Map produced by the Federal Emergency Management Agency.  In addition, seismic hazard information was provided via the appropriate government agency.

With regard to the market overview, the historical demand/supply data were derived from published market reports and through discussions with local real estate brokers.

In order to support the marketing time and the discount and capitalization rates, information from numerous sources and surveys was collected.

### *Specific Data*

*Subject Property*: The client provided the following information with regard to the subject property:

1) Expected an updated title report but it was not provided.  The appraiser relied on a title report prepared by Stewart Title Company dated August 18, 2014 that was provided for the previous appraisal that was completed in September 2018.
2) Engagement Letter

*Comparables:* Improved sales and rental comparables were obtained from the following sources:
1) The Appraiser's own files
2) CoStar Inc./Loopnet/Broker interviews/Public Records

*Governmental Agencies*: Planning, zoning and building department information was considered. Zoning, permitted uses, and development standards were verified with the City of Los Angeles Planning Department.

### *Site Inspection*

*Subject property*: The interior and exterior of the subject property was last inspected on January 17, 2023.

*Neighborhood*:  The appraiser has inspected the subject's neighborhood and visited the major thoroughfares in order to analyze the land use characteristics of the immediate market area.

*Comparables*:  The appraiser has closely examined all of the improved sales and comparable rentals and noted their overall physical characteristics in comparison to the subject property.

### *Valuation*

*Highest and Best Use*: Based on the market data gathered, the appraiser was able to determine the highest and best use of the subject *as if vacant* and *as improved*.

459 COLYTON STREET                                                                                    *8*
LOS ANGELES, CALIFORNIA

## SCOPE OF THE APPRAISAL

### *Valuation (Continued)*

*Valuation Applicability and Limitation*: The identified improved sales and comparable rentals in each approach were confirmed with the buyers, sellers or brokers. The significant adjustments were discussed in the text and are summarized in an adjustment grid.

*Cost Approach:* The Cost Approach was not applied in this appraisal due to the subject's age and difficulty in accurately estimating accrued depreciation. Furthermore, most investors do not make their purchasing decisions based on the value estimated via the Cost Approach. Due to the age of the subject, the cost approach has been excluded. The exclusion of the Cost Approach does not limit or restrict the appraiser's ability to estimate market value for the subject property.

*Income Approach:* The subject improvements have exhausted their useful life and is essentially land value. As such, the income capitalization approach is not applicable in this valuation analysis. The elimination of the income capitalization approach does no impede the ability to value the subject property. It should be mentioned that a brief income approach is presented in the highest and best use section of this report.

*Sales Comparison Approach:* The appraiser searched the market for the most similar sales. All of the comparable sales that were selected and presented in this appraisal, are discussed, analyzed and adjusted to the subject using the price per unit adjustment methodology.

*Reconciliation:* The above approaches were analyzed in order to arrive at a final estimate of value for the subject property.

## DEFINITION OF SIGNIFICANT TERMS

### *"As Is" Market Value*

"The estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal date."[1]

## PURPOSE OF THE APPRAISAL

The purpose of the appraisal is to estimate the "as is" market value of the fee simple interest in the subject property as of January 17, 2023, which was the date of our inspection.

## INTENDED USE AND USER OF THE REPORT

This appraisal report is intended for the client, EAST WEST BANK, and other authorized individuals. It may be used for potential loan underwriting or portfolio monitoring purposes. It may also be used in connection with the acquisition, disposition, and financing of the sale of the property. Any recipient of this report, other than our client, may only rely on the "as is" market value conclusion presented in this appraisal.

---

[1] *The Dictionary of Real Estate Appraisal*, 6th Edition, Appraisal Institute, 2015, Page 13.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**                                                     *9*

## PROPERTY RIGHTS APPRAISED

The subject property is 100% vacant with the exception of some related parties still occupying certain spaces. As such, the subject will be appraised on the basis of a fee simple estate, which may be defined as follows:

> *"Absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power and escheat."[2]*

## SIGNIFICANT DATES

| | |
|---|---|
| Date of Inspection: | January 17, 2023 |
| "As Is" Value: | January 17, 2023 |
| Date of Report: | January 26, 2023 |

## DEFINITION OF MARKET VALUE

Market Value[3] is defined as:

> *"The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus."*

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

a) Buyer and seller are typically motivated;
b) Both parties are well informed or well advised, and acting in what they consider their own best interests;
c) A reasonable time is allowed for exposure in the open market;
d) Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
e) The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

---

[2] *The Dictionary of Real Estate Appraisal*, Sixth Edition, Appraisal Institute, 2015, Page 90.
[3] Federal Deposit Insurance Corporation (FDIC) web site; FIRREA 12 C.F.R. Part 34

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**                                                *10*

## HISTORY OF THE PROPERTY

The appraiser received a title report for the subject property that was prepared by Stewart Title Company and dated as of August 18, 2014.  According to this document and other public records databases, title to the subject property is currently vested in the name of Capital KCS LLC, a California limited liability company.  The current owner acquired title to the subject on July 1, 2008 and the transaction was recorded under Document No. 08-1168201.  There have been no transfers of the subject property during the past three years.

The appraiser was provided with an offering memorandum that did not indicate a list price.  As of the date of value, there was one written offer submitted for $60,000,000.  According to the owner, Mr. Keven Chen, the purchase offer was declined in order to develop the proposed project.  The offer is just below the appraised value of $60,900,000.  Based on the bonafide offer for the subject, the appraised value is indicative current values for entitled land in the "Arts District."  Furthermore, to the appraiser's knowledge, there are no other pending purchase offers.

## OCCUPANCY AND USE

The subject consists of one, two-story commercial building containing 91,200± gross/rentable square feet.  As of the date of value, the subject is 100% vacant according to Mr. Kevin Chen. During our inspection Unit 451 (Admere Liquidations) was occupying their space.  It was further stated by Mr. Chen that the tenant is in the process of selling or removing the remaining merchandise.

It is important to mention that the owners have received entitlements for a mixed-use development project that consists of 129 live/work units (including 11% for very low income households), a 113 room hotel, 81,326 square feet of commercial space, and 304 parking spaces in a multi-level subterranean parking garage.  A demolition permit (20019-1000-03834) was also approved on October 17, 2022.

# REGIONAL MAP



Subject
459 Colyton St
Los Angeles, CA 90013

Copyright © and (P) 1988–2012 Microsoft Corporation and/or its suppliers. All rights reserved. http://www.microsoft.com/streets/
Certain mapping and direction data © 2012 NAVTEQ. All rights reserved. The Data for areas of Canada includes information taken with permission from Canadian authorities, including: © Her Majesty the Queen in Right of Canada, © Queen's Printer for Ontario. NAVTEQ and NAVTEQ ON BOARD are trademarks of NAVTEQ. © 2012 Tele Atlas North America, Inc. All rights reserved. Tele Atlas and Tele Atlas North America are trademarks of Tele Atlas, Inc. © 2012 by Applied Geographic Solutions. All rights reserved. Portions © Copyright 2012 by Woodall Publications Corp. All rights reserved.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**                                                                                    *11*

## AREA ECONOMIC ANALYSIS

## LOS ANGELES COUNTY

### Introduction

The subject property is located in Los Angeles County, which is one of California's original 27 counties having been established February 18, 1850.  Originally, the county occupied a comparatively small area along the coast between Santa Barbara and San Diego, but within a year its boundaries were enlarged from 4,340 square miles to 34,520 square miles, an area sprawling east to the Colorado River.  During subsequent years, Los Angeles County slowly contracted to its present size, the last major detachment occurring in 1889, with the creation of Orange County.  Today, Los Angeles County remains one of the nation's largest counties in terms of land area, encompassing 4,081 square miles, an area 800 square miles larger than the combined area of Delaware and Rhode Island.  Los Angeles County is bordered on the east by Orange and San Bernardino Counties, on the north by Kern County, on the west by Ventura County, and on the south by the Pacific Ocean.  Its coastline is 81 miles long.  Los Angeles County also has the highest population of any county in the nation, and it accounts for approximately 25.5% percent of California's total population.

Los Angeles County has varied terrain with beach, mountain, and desert communities.  The low-lying Santa Monica Mountains and Hollywood Hills run east and west, forming the northern boundary of the Los Angeles Coastal Basin and the southern boundary of the San Fernando Valley.  The San Fernando Valley extends north to the base of the Santa Susana and San Gabriel Mountain ranges, beyond which lies the balance of the county along the western edge of the Mojave Desert.

### Population

The population in Los Angeles County declined for the second consecutive year according to the most recent population estimates prepared by the California Department of Finance.  The estimated population in Los Angeles County as of January 1, 2022, was 9,861,224 residents, which is a 0.7% decline since January 1, 2021.  The compound annual average population growth within the County since the year 2000 also fell to just 0.16%.  Similarly, the City of Los Angeles, which is the County seat, also exhibited a third consecutive year of decline in population, going from 3,853,323 in January 2021, to 3,819,538 as of January 1, 2022.  The compound annual average population growth for the City of Los Angeles since the turn of the century slipped to 0.20%.  Projections prepared by the California Department of Finance forecast nominal population growth in Los Angeles County of just 0.2% through 2025.

### Education

The two premier educational institutions in the Los Angeles area are the University of Southern California and the University of California, Los Angeles.  Within Southern California there are a total of 36 California Community Colleges, 7 California State University campuses, 3 University of California campuses, and 93 private colleges and universities.

459 COLYTON STREET                                                                              *12*
LOS ANGELES, CALIFORNIA

# AREA ECONOMIC ANALYSIS

## LOS ANGELES COUNTY

### *Employment and Industry*

One of the most outstanding features of the five-county Los Angeles Metropolitan Area is the sheer size of its economy. The Los Angeles area economy encompasses all facets of industry, from manufacturing to services. Data provided by the *State of California - Employment Development Department* dated October 21, 2022, reveals that the Los Angeles Metropolitan Statistical Area (MSA) had total non- farm employment in September 2022 of 4,550,100, which is a decrease of 17,000 jobs from the previous month. The region's greatest concentration of employment is in education and health care services, followed by professional and business services, and then by government.

A breakdown of employment by sector is shown below.

*Wage & Salary Employment by Industry*
*In the Los Angeles Area[4]  (in 1000's)*

| | | | |
|---|---|---|---|
| Agriculture | 4.8 | Transport/Warehouse & Utilities: | 226.7 |
| Mining & Logging: | 1.6 | Information: | 231.1 |
| Construction: | 156.5 | Finance & Insurance: | 126.6 |
| Manufacturing: | 319.7 | Real Estate & Rental & Leasing: | 89.6 |
| Government: | 559.0 | Professional & Business Services: | 671.2 |
| Retail Trade: | 414.9 | Education & Health Services: | 882.8 |
| Wholesale Trade: | 208.3 | Leisure & Hospitality: | 505.8 |

### *Unemployment Rates (Not Seasonally Adjusted)*
### *Los Angeles County & California (2006-2022)*

| Year | Unemployment Rate | |
|---|---|---|
| | **Los Angeles County** | **California** |
| 2008 | 7.5% | 7.2% |
| 2009 | 11.6% | 11.4% |
| 2010 | 12.7% | 12.1% |
| 2011 | 12.4% | 11.7% |
| 2012 | 10.2% | 9.8% |
| 2013 | 9.2% | 8.3% |
| 2014 | 8.1% | 7.4% |
| 2015 | 5.9% | 5.7% |
| 2016 | 5.1% | 5.0% |
| 2017 | 4.4% | 4.3% |
| 2018 | 4.7% | 4.2% |
| 2019 | 4.4% | 3.9% |
| 2020 | 11.0% | 8.2% |
| 2021 | 8.4% | 6.5% |
| 2022 | 7.0% | 5.8% |
| September 2022 | 4.8% | 3.9% |

---

[4] *Source: State of California Employment Development Department –October 21, 2022*

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**

## AREA ECONOMIC ANALYSIS

## LOS ANGELES COUNTY

### *Employment and Industry (Continued)*

The COVID-19 pandemic and ensuing economic shutdown had a significant impact on the unemployment rate over the past two years. The unemployment rate in Los Angeles increased from 4.4 percent just prior to the outset of the Pandemic (January 2020) and increased to near 20.0 percent within the first couple of months following the initial outbreak. Since May 2020, the unemployment rate in Los Angeles County has slowly continued improving as employees have been allowed to return to their workplaces.

The seasonally adjusted unemployment rate in Los Angeles County declined over the month to 4.8 percent in September 2022 from a revised 5.2 percent in August 2022 and was below the rate of 7.6 percent a year ago. Civilian employment declined by 24,000 to 4,763,000 in September 2022, while unemployment declined by 23,000 to 238,000 over the month. The civilian labor force declined by 46,000 over the month to 5,001,000 in September 2022. All of the above figures are seasonally adjusted. The unadjusted unemployment rate for the county was 4.5 percent in September 2022. The California seasonally adjusted unemployment rate was 3.9 percent in September 2022, 4.1 percent in August 2022, and 6.4 percent a year ago in September 2021. The comparable estimates for the nation were 3.5 percent in September 2022, 3.7 percent in August 2022, and 4.7 percent a year ago.

Between August 2022 and September 2022, nonfarm employment increased by 17,000, from 4,533,100 to 4,550,100. Educational and health services registered the largest month-over gain increasing by 7,400 jobs. Educational services added 8,400 jobs and within this subsector, colleges, universities and professional schools led job expansion adding 8,000 jobs. Total sectoral gains were offset by losses in health care and social assistance (down 1,000). Government added 6,800 jobs, the most so far in 2022. Expansion in local government (up 5,000) accounted for 74 percent of the increase within the sector. Local government educational services added the most within the subsector gaining 5,600 jobs, while losses in local government excluding educational services (down 600) offset the subsector gains. State government and federal government contributed to the total sector expansion by adding 1,400 and 400 jobs respectively. Four other sectors increased over the month including professional and business services (up 6,100), other services (up 2,500), leisure and hospitality (up 2,100), and financial activities (up 300). Trade, transportation and utilities had the largest month-over decline losing 2,800 jobs. Three other sectors declined over the month including manufacturing (down 2,100), construction (down 1,700), and information (down 1,600). Mining and logging remained unchanged.

Between September 2021 and September 2022, nonfarm employment increased by 186,100, or 4.3 percent. Nine out of the eleven sectors expanded over the year with educational and health services (up 41,800) leading the job gains. This sector made up twenty-two percent of total year over gains. Health care and social assistance added 31,100 jobs over the year, followed by increases in educational services (up 10,700). Trade, transportation and utilities expanded by 35,900. Retail trade (up 15,500) gained the most over the year. Employment in transportation, warehousing, and utilities grew by 14,000, 99 percent of which came from transportation and

**459 COLYTON STREET**                                                              *14*
**LOS ANGELES, CALIFORNIA**

## AREA ECONOMIC ANALYSIS

## LOS ANGELES COUNTY

### *Employment and Industry (Continued)*

warehousing (up 13,900).  Wholesale trade (up 6,400) completed the overall sectoral gain.
Seven other sectors increased over the year including leisure and hospitality (up 34,500),
professional and business services (up 32,300), other services (up 16,600), construction (up
8,800), manufacturing (up 8,300), financial activities (up 6,800), and information (up 5,400).
Mining and logging remained unchanged.  The only sector to decline over the year was
government (down 4,300). Local government decreased by 4,700 jobs, followed by losses in
federal government (down 400). Total sectoral losses were offset by gains in state government
(up 800).

### *Travel & Tourism*

Some of the attractions within a short drive of Los Angeles include: the Disneyland Resort,
which includes Disneyland and the California Adventure theme parks, Knott's Berry Farm, Six
Flags Magic Mountain, Universal Citywalk, Universal Studios, the Hollywood and Melrose
areas, the beach communities of Santa Monica, Venice, Malibu, and Manhattan Beach, L.A.
Live as well as numerous theaters, museums, and sporting venues.  Despite the recent economic
turmoil, Los Angeles continues to be one of the largest tourist destinations in the United States;
and tourism is an important source of revenue for the Los Angeles economy.  The recent
COVID-19 pandemic has shut down this segment of the economy for the short term, and it
remains to be seen how quickly this industry recovers now that most venues are allowed to re-
open.

### *Transportation and Trade*

The Los Angeles Metropolitan Area is a classic example of the multiple nuclei theory of
urbanization.  Its formation into an urban conglomerate of multiple centers was facilitated by the
proliferation of automobiles and the construction of numerous highways and interstate freeways.
 International and regional airports accentuate transportation in the area, as do the port facilities,
and rail lines that are conveniently situated throughout the region.  While Los Angeles is served
by all modes of transportation, as noted, the dominance of the highway system is evident.  The
Los Angeles Basin is crisscrossed by interstate freeways connecting it to all other areas of
Southern California and the southwestern United States.

In recent years, reliance upon automobiles and the lack of a functional public transportation
system have highlighted the congestion brought on by increased population.  The crowded and
congested surface streets and freeways often result in long travel times and are triggering the
imposition of traffic mitigation and traffic generation fees for new development.  Attempts are
being made to alleviate the congestion through public transit development in Los Angeles
County and surrounding areas.

## AREA ECONOMIC ANALYSIS

## LOS ANGELES COUNTY

### *Transportation and Trade (Continued)*

The Metrorail program, consisting of a series of interconnected subway, bus, and light rail lines, has been in development for more than twenty years now. The subway and light rail trains currently service much of downtown Los Angeles and Hollywood. MetroLink, a light rail system utilizing the Southern Pacific's rights-of-way, complements these trains and connects the surrounding valleys to Downtown Los Angeles' Union Station.

In addition, the County has the ever-expanding light-rail system, passenger and freight rail which abound throughout Southern California. Connections provide service to other parts of the continental U.S. and Canada. The proximity of several international and regional airports in the L.A.M.A. has also played an important role in the growth of international trade. Los Angeles International Airport is one of the busiest commercial airports in the United States. Twenty-three miles south of Downtown, the Ports of Los Angeles and Long Beach provide sea transportation and cargo facilities and combined represent the West Coast's largest man-made port.

### *Conclusion*

In summary, the Los Angeles Metropolitan Area recovered from the recession of 2008/2009, which resulted in significant job losses throughout Los Angeles County and the nation and there was sustained improvement in the unemployment rate between 2012 and 2020, with unemployment beginning 2020 near record lows. However, with the onset of the COVID-19 pandemic in March 2020, many businesses were ordered closed, resulting in massive layoffs. Within two months of the start of the pandemic, the unemployment rate skyrocketed to near 20.0%, but now more than a year from the onset, the unemployment rate has steadily declined to a rate of 4.8%. Despite the lingering impacts of the COVID-19 pandemic, Los Angeles County has a well-diversified economy that has historically persevered through economically turbulent times.

## LOCATION MAP



Subject
459 Colyton St
Los Angeles, CA 90013

Copyright © and (P) 1988–2012 Microsoft Corporation and/or its suppliers. All rights reserved. http://www.microsoft.com/streets/
Certain mapping and direction data © 2012 NAVTEQ. All rights reserved. The Data for areas of Canada includes information taken with permission from Canadian authorities, including: © Her Majesty the Queen in Right of Canada, © Queen's Printer for
Ontario. NAVTEQ and NAVTEQ ON BOARD are trademarks of NAVTEQ. © 2012 Tele Atlas North America, Inc. All rights reserved. Tele Atlas and Tele Atlas North America are trademarks of Tele Atlas, Inc. © 2012 by Applied Geographic Solutions. All
rights reserved. Portions © Copyright 2012 by Woodall Publications Corp. All rights reserved.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**
*16*

## AREA ECONOMIC ANALYSIS

## THE ARTS DISTRICT – DOWNTOWN LOS ANGELES

The subject property is situated within the Arts District of Downtown Los Angeles.  The Arts District occupies the eastern side of Downtown Los Angeles.  Its borders are roughly Alameda Street on the west, Temple Street on the north, the LA River on the east, and 6th Street on the south.

The Arts District is filled with older, industrial and former railroad buildings.  In 1981, the City of Los Angeles passed its "Artist in Residence" or "AIR" ordinance, which allowed residential use of former industrial buildings (artists had long used such spaces as living quarters illegally, and the AIR law sought to bring this practice into legality and regulation).  In the 1970s, these buildings started to become popular with the L.A. Art Community, and artists began buying and renting the buildings for their potential as artist lofts.  By the turn of the 21st Century, the popularity of the neighborhood started attracting wealthy residents looking for the "artist lifestyle".  However, many of the new residential developments of the 21st century have been done by traditional real estate developers, as opposed to artists themselves.

With the growing demand for artist's lofts, real estate developers have taken to creating ready-made "lofts" in urban areas that are gentrifying or that seem primed to do so.  While some of these units are created by developers through the extensive and costly renovation of older buildings, a number of them are included in the floor plans of brand new developments.  Both types of lofts offer buyers or renters the proximity to urban amenities afforded by traditional lofts, but without the perceived safety risks of living in antiquated industrial buildings.

For most of Los Angeles' history, the Arts District was dominated by industrial and railroad concerns, and many of the buildings were owned or occupied by well-known companies including: Nabisco, Heinz and the Santa Fe Railroad.  Many of these now functionally obsolete industrial buildings that were built in the early-to-mid 1900's are now being used in adaptive re-use projects.  Former industrial locales are continuing to gentrify, with new artist loft units being built-out within the shell of these obsolete manufacturing and warehousing buildings.  Some of the older historic buildings in the Arts District have already been transformed into ultra-modern live/work lofts.  These properties include: the 2121 Lofts, the Toy Factory Lofts, the Biscuit Company Lofts, Molino Lofts and the Barker Block.

The Arts District also benefits from its central location that is close to several Los Angeles attractions.  These attractions include: the multi-million dollar L.A. Live project, the renowned Los Angeles Museum of Contemporary Art, Japanese American National Museum, the Los Angeles Children's Museum and Exhibition Park with the Science Center, I-MAX and Natural History Museum.  Along the cultural corridor of Grand Avenue are the Colburn School of Performing Arts, the Fashion Institute of Design and Merchandising, the Los Angeles Music Center (Dorothy Chandler Pavilion, Mark Taper Forum, Ahmanson Theater and Walt Disney Concert Hall), and the Cathedral of Our Lady of the Angels.  Nearby sports and entertainment venues include: the Los Angeles Memorial Coliseum, Staples Center and Dodger Stadium.

459 COLYTON STREET                                                                                17
LOS ANGELES, CALIFORNIA

## AREA ECONOMIC ANALYSIS

## THE ARTS DISTRICT – DOWNTOWN LOS ANGELES

The Arts District is served by a comprehensive network of freeways and surface streets that simplify ingress and egress and connect the community with other areas of Southern California. The local freeways serving the community include the SR-60, 101 (Hollywood) Freeway, the Santa Monica (I-10) and Golden State Freeways (I-5). The Interstate 101, 10 and 5 interchange, which is less than one mile southeast of the subject property, is one of the most heavily traveled highway junctions in the country, particularly among freight carrying trucks, with daily vehicle traffic volumes estimated at over 500,000 motorists per day. The I-5 Freeway extends between the Mexico and Canadian borders, while the 10 Freeway connects California and the Pacific Ocean on the west coast, with Florida and the Atlantic Ocean on the east coast. The Arts District transportation network is also anchored by downtown's Union Station located just one mile north of the subject property. There are also plans in place to create a new Red Line subway stop at the intersection of Santa Fe Avenue and 3rd Street, which is about one-half mile northeast of the subject site.

### Immediate Area

The subject property has frontage on Colyton Street, E. 5th Street and Seaton Street. This locale is near the heart of the Arts District. The subject is surrounded by similar industrial buildings most of which have been converted to alternate commercial and live-work spaces. Notable developments in the immediate area include the Arts District Park, which is a recently completed park and open space located at the southwest corner of E. 5th Street and Hewitt Street. Additionally the large Barker Block live-work community is situated on the east side of Hewitt Street between E. 5th Street and Palmetto Street.

Major east/west thoroughfares in the subject neighborhood include 1st, 3rd, 4th, and 7th Streets. The primary north/south streets are S. Alameda Street and Central Avenue. Each of these thoroughfares receives significant vehicular traffic. In addition, the subject is near the center of a ring of freeways that surround downtown Los Angeles. This ring of freeways includes the 110, 101, the 10 and the 5 freeways. The subject is located within one-mile of all four of these freeways. Therefore, access to the subject may be obtained easily from all over southern California. The proximity of all necessary services--including public transportation, shopping, health care and recreation is within a short distance of the property.

The Arts District is one of the fastest growing submarkets in the region. Its evolution as one of the top choices for creative office tenants and the burgeoning demand for production/studio space, has drawn billions of dollars of investment capital from around the country. The Property is located near the Greyhound Bus Terminal, which was recently sold to Prologis and is planned for studio/production development. Originally, the Arts District was a low-rise industrial hub, comprised of heavy manufacturing uses and warehouses, but in the 1900's the area underwent a transformative period, spurred by the influx of artists that began to move into its confines. The Arts District still retains the transitive charm reflected in the many murals that can be seen throughout the streets of the area. In recent years, Arts District real estate has been quickly gobbled up by rapidly growing media and entertainment companies seeking an area that embodies characteristics representative of their brands. This inflated demand has pushed forth substantial efforts for supply to accommodate the ever-growing demand. Because of recognizable supply constraints, the Arts District has become a development hotspot for both ground up and adaptive reuse projects.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**

*18*

## AREA ECONOMIC ANALYSIS

## THE ARTS DISTRICT – DOWNTOWN LOS ANGELES

### Immediate Area

The immediate area is filled with new buildings proposed and under construction. Per Downtown Center Business Improvement District (DCBID), there are four buildings under construction in the Arts District. A nine story complex is under construction at 2130 E. Violet Street for 96,700 square feet of office space and 3,300 square feet of retail. It is expected to complete in 2022. A 35 story development is under construction at 520 Mateo (No. 8 in the following map) with 20,000 square feet of retail, 105,000 square feet of office and 475 apartments (52 as affordable). AVA Arts District will be a seven story building with 61,000



square feet of retail and 475 apartments (53 affordable) set to complete in 2022. AtTraction is a six story building that is currently being completely renovated and expected to be completed in 2023. It contains 63,100 square feet of office space and 16 apartment units. There are also many proposed developments in the area. One of the newest mega projects is the $2 billion master plan at 4th Street and Central Avenue for a greater than 2 million square foot mixed use neighborhood. It will feature 10 buildings of primarily residential with 1,521 units of housing and 401,000 square feet of offices, a 68-room hotel, and 93,000 square feet of retail and restaurant space. This property is shown below labeled Continuum Partners. The following map shows the subject (denoted in red as ADC) and the projects in the Arts District that are in close proximity to the subject. It is important to note that there was a recent purchase at 1206 E. 6th Street (See Project 10 on map above). The buyer is proposing to raze the existing structures and develop the site with sound stages that will be known as East End Studios. The proposed development will include 321,520 SF of studio space across 16 soundstages, 292,310 SF of creative office, and 106,570 SF of production support space. It will also provide parking for 1,327 spaces cars in a mostly underground garage.

## AREA ECONOMIC ANALYSIS

## THE ARTS DISTRICT – DOWNTOWN LOS ANGELES

### *Immediate Area (Continued)*

In summary, there are approximately 113,000 square feet of creative office space under construction with an additional 3.5 million square feet proposed. There are 1,550 existing multi-family units in the Arts District with 950 units under construction and 3,377 proposed units.

### *Strengths, Weaknesses, Opportunities, Threats (SWOT)*

The following section identifies internal and external factors under each of the four categories. The strengths and weaknesses specifically focus on the subject property; while the discussion of opportunities and threats address factors external to the subject property.

*Strengths* - The subject property is located in a rapidly gentrifying area of Los Angeles that has seen substantial redevelopment over the past ten years and a transition of predominantly industrial use to adaptive commercial uses that include creative office, live-work and retail. In the next six years, the Los Angeles area will host to the 2026 World Cup and 2028 Summer Olympics. Along with the proposed developments and these international events in the LA area, the proposed subject will benefit from those looking for housing or hotel stays. As retail, and residential vacancy remain below 10.0% in most areas of downtown, the subject property should continue to benefit and appeal to potential buyers as a redevelopment or repurposing opportunity.

*Weaknesses* – The subject property is situated along secondary streets that offer minimal exposure, thus the appeal of the subject would be primarily for secondary uses that include live-work and creative office uses. Retail uses would likely have difficulty in maintaining profitability in the subject's locale. The subject is also an older building and would have some difficulty in achieving rental rates that some of the other renovated buildings in the area are currently exhibiting.

*Opportunities* – The subject property's opportunities include the potential for redevelopment or renovation. The subject currently has entitlements to construct a new mixed use retail, residential and hotel building. Similar buildings in the subject area that have been renovated are exhibiting commercial retail and creative office rental rates above $4.00/SF/Month, modified gross.

*Threats* - The primary threat for the subject property comes from local competition in the market. There are an abundance of similar industrial buildings in the market that could become directly competitive with the subject if transformed from their current manufacturing and warehouse uses.

### *Conclusion*

In conclusion, the Arts District and the subject's vicinity are increasingly becoming a desirable place to live and work within Downtown as a result of the redevelopment and entertainment projects that have already, and continue to take place in the neighborhood.

**459 Colyton Street**
**Los Angeles, California**

## APARTMENT MARKET OVERVIEW

### Introduction

The subject property is located in Downtown Los Angeles region of the West Los Angeles County apartment market.  Data herein was obtained from a 4th Quarter CoStar Downtown Los Angeles Multi-family report, 3rd Quarter 2022 Apartment Research Market Report for the Los Angeles County apartment market prepared by Marcus & Millichap and also the Berkadia – 3rd Quarter 2022 Report for the Los Angeles apartment market.  The surveys summarize trends within the Los Angeles County apartment market.  Additionally, the appraiser reviewed several articles pertaining to the apartment market both for Los Angeles County and specifically the Los Angeles market.

### Vacancy

The structural advantages of the Los Angeles multi-family market should help the region weather turbulences better than most parts of the country.  Los Angeles' population is young, and housing is expensive, which benefits apartment owners.  According to the CoStar DTLA multi-family Submarket Report, current vacancy rates stand around 8.0%.



Vacancy in the DTLA Submarket has been in decline in recent quarters after spiking in 2020, similar to much of the Greater Los Angeles apartment market.  Over the past five years, vacancy has averaged 9.8%, also well above the 4.5% seen in L.A. County during this time.  The outlook anticipates vacancy to modestly rise during the next several years. Even with healthy demand, the submarket will need to absorb an additional 4,500 under construction in the near to midterm.

The appraiser also reviewed a CoStar analytic survey of multi-family properties within a ½ and 1-mile radius of the subject.  The results of this survey are shown on the table below.

|         | Current | 3-Year | 10-Year Avg. | 10-Year Min. | 10-Year Max |
|---------|---------|--------|--------------|--------------|-------------|
| 0.50 mi. | 4.6%   | 7.7%   | 7.8%         | 3.8%         | 21.2%       |
| 1 mi.    | 8.6%   | 9.0%   | 6.3%         | 3.9%         | 11.4%       |

*Source: CoStar*

As seen from the table, the ½ mile radius area is outperforming the overall DTLA apartment market.

### Rents

Average asking rents in the DTLA submarket are currently $2,727/month.   Rental rates bottomed at the end of 2020 and increased through 2021. Average asking rents increased by 0.6% during the past 12 months. Historically, Downtown Los Angeles was a relatively affordable apartment market in Central L.A.; however, the construction boom over the past decade, which has almost tripled



## APARTMENT MARKET OVERVIEW

*Rents*

the inventory of 4 & 5 Star units, has raised the profile of the submarket. Average rents for 4 & 5 Star properties, $2,990/month, are well above the average for its lower-quality, 1 & 2 Star properties, $1,200/month. The outlook for rents anticipates the strong gains experienced in recent quarters will moderate through the rest of the year. Over the next five years, the submarket is expected to see around 2.8% average annual rent growth. The appraiser also reviewed a CoStar analytic survey of multifamily properties within a ½ and 1-mile radius of the subject. The asking rent/unit from this survey indicates an average of $2,568/Month in a ½-mile and $2,198/Month in a 1-mile radius.

*Construction*

In the Metropolitan Los Angeles area had nearly 2,400 units were delivered in Los Angeles County during the third quarter, contributing to the 10,800 rentals finalized over the past 12 months. Greater Downtown Los Angeles and the San Fernando Valley each added more than 800 apartments from July to September according to Marcus and Millichap. Hendrick Berkadia indicated that there were 689 units absorbed the Downtown Los Angeles area and a total of 1,765 apartment units added over the past year.

Being one of the few areas receptive to densification in L.A. County, Downtown Los Angeles has been an apartment development hub for years. The submarket has seen 8,400 net new units deliver during the past five years. Development activity has been skewed toward high-end communities seeking affluent renters. 75% of the submarket's inventory is composed of high-end 4 & 5 Star units, compared to only around 10% of units in the Greater Los Angeles apartment market.



There are presently 4,500 apartment units under construction, which represents 12.2% of existing units, well above the 2.8% seen across the Greater Los Angeles apartment market. The largest project underway is Beaudry, a 785-unit tower by Brookfield Properties. The project will open in the first half of 2023. During the 4th Quarter 2022 a portion of The Ferrante, a 1,150-unit mid-rise from prolific Downtown developer G.H. Palmer and Associates was completed. The complex is at the intersection of the 101 and 110 freeways, along with sister communities by the developer, The Orsini and the Da Vinci. Once the community completes, G.H. Palmer's will control roughly 5,000 units in seven Downtown communities.

Based on a review of "In the Pipeline" article prepared Downtown Center Business Improvement District (DCBID) website there are currently 2,472 proposed units within 12 projects in the Arts District. Addtionally, the appraiser reviewed a CoStar analytics report within a ½-mile radius of the subject. According to the report, there are five projects that are proposed or under construction that will contain a combined 1,455 units.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**

*22*

## APARTMENT MARKET OVERVIEW

### Sales and Cap Rates

Downtown Los Angeles saw $1.1 billion of multifamily sales in the previous 12 months. This is well above the submarket's 10-year annual average of $482 million. Due to the high concentration of luxury units, in the DTLA market, the average market pricing is approximately $590,000/unit. As a result, the average pricing is toward the higher end for L.A. submarkets. Average cap rates, 3.6%, are below the metro average of 3.9%. Sales activity was modest in 2020 and 2021, but in recent quarters, several major properties traded.

### Market Participants

Many investors are looking to acquire more assets throughout the national apartment market. Most apartment complexes under 50 units are purchased by individual investors or limited partnerships. Larger properties are being bought in this market by limited partnerships, institutional investors including REIT's, domestic pension funds, and real estate advisors.

### Conclusion

A diverse economic, social, and cultural base, along with its coastal location, makes the Los Angeles County area a highly desirable place to live. It is located in a very strong region where many job opportunities are available. As a result, the local apartment market has been stronger than most in the nation. Specifically, the Los Angeles market provides the residents all necessary services, including the proximity to various entertainment possibilities as well as some of the best beaches in the world. However, in the past two years deliveries have exceeded demand resulting in a higher vacancy rate. The forecast for the subject's overall Los Angeles County market appears positive through 2023 as deliveries slow and the nation recovers from the COVID 19 pandemic. The rents in the subject's market are reasonable as the location is good within close proximity to the Downtown core, as well as LA Live.

# RETAIL MARKET OVERVIEW

### Introduction

The subject property is located on the north side of 5th Street between Colyton and Seaton Streets, in downtown Los Angeles.  The site is zoned C2-2, which allows most commercial uses including the existing retail use.  As such, we will include a retail market overview for the subject's downtown submarket.  Downtown Los Angeles retail was hit hard during the pandemic, but long-term tailwinds from multi-family construction that have exponentially increased the size of the local residential community over the past two decades helped buoy the impact of stay-at-home orders that left the area's office buildings at low occupancy rates for many months.  As workers return to the office and patrons return to theaters and sporting events, restaurant spaces that vacated have started to generate an uptick of interest.  The retail market overview will be presented first followed by the office market overview. The information contained in this retail market study is based on a variety of sources including interviews with local leasing agents and published information obtained from *CBRE* and *CoStar*.

### National Economic Trends

Market sentiment took a turn for the worse during the first quarter of 2022, with Russia's invasion of Ukraine magnifying existing economic concerns.  Specifically, the exclusion of Russian oil and gas from global markets has pushed the price of gasoline to record levels domestically.  The increase in energy prices is also having repercussions on other consumer items, which recently led to the highest inflation rate seen in the last forty years.  Inflation has already rattled consumers, and the Federal Reserve has begun a campaign of increasing interest rates to curb inflation.  Now there are new concerns of a pending recession or possibly even a depression, which is starting to impact the stock market and consumer confidence.

The prospects of weaker global growth, particularly in Germany and China, and rising interest rates are causing some alarm.  Bond markets are pricing in rate hikes through 2023, with a terminal Fed Funds rate of 3% to 3.5%.  On the upside, consumer demand is still expected to remain elevated this year, driven by excess savings during the pandemic, especially among more affluent households, and a strong labor market.  This is expected to translate into another year of above trend annual growth, at 2.4% according to *CBRE*.  It is possible that these tailwinds will fade quicker than the downside risks and weaker economic growth should be expected next year.  The beginnings of an inverted yield curve are hinting at a recession starting either late this year, or in 2023.  Nonetheless, there is still plenty of momentum left in the U.S. economy, but short to medium-term economic risks are rising.

### Retail Inventory

According to *CoStar's* submarket report, as of the end of the 3rd quarter 2022, Downtown contained roughly 17.1 million square feet of retail inventory.  Looking closer, within a 1-mile radius of the subject, there are 384 retail buildings containing 6,235,082 square feet, and within a half-mile there are 52 retail buildings containing 705,584 square feet.

## RETAIL MARKET OVERVIEW

### Vacancy Rates

The current vacancy rate in Downtown Los Angeles (7.1%), is above the Greater L.A. retail market average of 5.0%. There was 4,400 SF of net absorption that occurred over the past 12 months. Leasing activity has been modest since the onset of the pandemic, but a handful of tenants have inked deals in recent months. Vacancy rates within one mile of the subject, have exhibited a range between 5.3% and 9.1% over the last 10 years. The current rate is 8.5%, which is above the submarket's vacancy rate of 6.9%. However, when looking closer into the subject's immediate area, the vacancy rate within a quarter mile is just 6.1%.



### Lease Rates

Average retail asking rates of $3.17/SF/month are modestly above the L.A. metro retail average. Rents are supported by a high daily worker population and a growing residential community. Year-over-year rents declined for the first time in more than eight years during the 2nd quarter of 2020, due to the global COVID-19 pandemic, but have since reversed course. Asking rents in the submarket increased by 3.0% year-over-year. Long-term growth has been limited as rents have only cumulatively increased by 4.1% over the past five years. Although downtown is one of the smallest geographical submarkets, it has many different neighborhoods that can vary widely in terms of product type and asking rate. Neighborhoods can also change block by block. Looking closer at the subject's immediate area, the average triple net rate is $3.44/SF/Month the one-mile radius and much higher in the half-mile radius at $4.15/SF/Month.

### Net Absorption

In the Downtown Submarket the net absorption in the last 12 months was 4,400 square feet, while the historical average is 39,949 square feet per month. Within one mile of the subject property, net absorption this year has been a negative net absorption 46,184 square feet, while the half-mile radius indicate a positive net absorption of 21,346 square feet during the same period.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**

# RETAIL MARKET OVERVIEW

### *New Construction*

Related California's The Grand project on Bunker Hill recently completed.  The project comprises 175,000 SF of retail space, along with a 436-unit rental community, as well as a 305-room Hilton Conrad branded hotel.  The retail portion includes 71,000 SF dedicated to bars, cafes, and restaurants with the balance composed of three levels of retail shops.  Smaller retail projects on Bunker Hill have upgraded dining options at the Wells Fargo Plaza and 2Cal office towers.  The most significant of these projects is Brookfield's Halo, a 65,000-SF retail center that has undergone significant renovations at the Wells Fargo Plaza.  The new center has two restaurants open, Danny Boy's Famous Original, a New York-style pizza place by chef Daniel Holzman, as well as Nick + Stef's Steakhouse and Shake Shack.  The space has a dedicated tenant lounge and a rooftop deck. Across the street, the 2Cal Plaza completed upgrades on its outdoor spaces.  Currently, there are no buildings under construction within a one mile radius.

### *Conclusion*

The subject property has a good retail location within the Downtown Submarket of Los Angeles and the property has frontage on three streets that include Colyton, Seaton and 5th Streets.  The subject is located close to a variety of downtown attractions, including LA Live, City Hall, the Disney Concert Hall and Little Tokyo. Excellent demographics and strong tourism underpin this status.  Over the long term, the subject's location is expected to continue benefitting the subject property and it is expected to maintain a high level of interest from both potential tenants and investors.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**

## HOSPITALITY MARKET OVERVIEW

The subject has entitlements for a 113-room hotel, therefore, a hotel market overview will be presented.  Upon researching the market and speaking with the competitive hotel owners and managers, the appraiser found that there is no published information available on hotels located in the Camarillo market.  Therefore, much of the local hotel data is based on interviews with local hotel operators.  Furthermore, for the purpose of getting a better understanding of the national hospitality market conditions, we reviewed published information presented by Marcus & Millichap, HVS, and CoStar.

### California Hospitality Market

According to the *Marcus and Millichap* Mid-Year 2022 Hospitality Market Report Los Angeles accounted for the fourth-highest number of bookings among major U.S. markets during the 12-month stretch ended in May.  The total revenue estimated in Los Angeles during that time was $5.3 billion for area hotels.  During the early portion of 2022, the sector received a boost from the metro hosting NASCAR's Clash at the Coliseum and Super Bowl LVI.  Looking ahead, a plethora of major events are scheduled that will draw attendees from outside the metro.  In July, Dodger Stadium hosted the MLB All-Star Game, with trade shows and concerts returning in mass to area venues in the second half of 2022.  These happenings will lift ADR and elevate revenues beyond pre-pandemic levels, however occupancy, while improved, will not fully recover this year.

Investors focus on low-entry cost assets and markets with outdoor activities.  The nationwide disruption to hotel investment varied by region. California and Texas continued to be popular destinations among hospitality investors.  These trends are likely to continue this year. Hotels in California, while subject to stricter lockdowns, have long-term appeal aided by comfortable weather and numerous natural attractions including beaches and national parks.

California for 2020, showed occupancy rate at 48.6% which is a drop in 2,640 basis points from last year.  RevPAR was $63.09 which is a sharp decrease of 51% from previous year.

### Los Angeles Hotel Market

The Los Angeles hotel market, along with the rest of the world, experienced an unprecedented drop in demand in 2020 following the start of the COVID-19 pandemic. Hotel occupancy declined to 49% in 2020, compared to 80% in 2019, while average daily rate (ADR) decreased to $139 in 2020 from $181 the previous year. According to the Mid-Year 2022 Marcus & Millichap report, annual occupancy will surpass the 70 percent in nearly all submarkets this year, enabling the metro's ADR to reach a record mark of $201.65 per night. This rate is nearly 25 percent above the 2019 recording. Overall, revenue per available room (RevPAR) increased 40.2%.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**                                                                 *27*

## HOSPITALITY MARKET OVERVIEW

### *Los Angeles Hotel Market*

The forecast assumes a recovery to 2019 levels after 2025, as illustrated in the following table.

**Los Angeles Forecast**

| | Historical | | | Forecast | | | |
|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
| Occupancy | 79.6% | 48.9% | 60.7% | 69.2% | 74.0% | 72.0% | 74.1% |
| Percent Change | | -38.6% | 24.1% | 14.0% | 7.0% | -4.0% | 3.0% |
| Average Rate | $180.16 | $138.95 | $135.97 | $146.85 | $157.13 | $167.35 | $176.55 |
| Percent Change | | -22.9% | -2.1% | 8.0% | 7.0% | 6.5% | 5.5% |
| RevPAR | $143.41 | $67.95 | $82.54 | $101.62 | $116.35 | $128.87 | $140.03 |
| Percent Change | | -52.6% | 21.5% | 23.1% | 14.5% | 10.8% | 8.7% |

Per CoStar, Los Angeles CBD is the largest hotel submarket in the Los Angeles market, with about 16,000 rooms spread across some 170 properties. The average hotel in Los Angeles CBD has about 93 rooms, which does not substantially differ from the market-wide norm or the national norm.

The Los Angeles CBD submarket has a diverse hotel stock, but is first and foremost characterized by high-end hotels: Over half of the rooms are Luxury or Upper Upscale, a proportion only found in the top 5% of U.S. submarkets. Cost-efficient lodging can be found, however, and in fact is unusually common in a submarket with such an otherwise high concentration of luxury properties.

The occupancy rate in Los Angeles CBD collapsed to 22.0% for the month of April 2020, shortly after the onset of a global pandemic that severely impacted the hospitality sector across the U.S. RevPAR is down sharply on a year-over-year basis, most recently by 65.9% as of April. That's an even steeper decline than the 53.2% drop in the market.

The Los Angeles CBD Submarket has the most hotel rooms under construction among the 10 submarkets that make up the Los Angeles market. There are 1,200 rooms currently under construction, which represents a 7.6% expansion to the existing inventory. In the past three years only 870 rooms have been delivered. The impact on the hotel inventory was offset by demolition activity, which took around 480 rooms off the market over the same timeframe as hotels were converted to alternative uses. Los Angeles CBD recorded 11 hotel trades over the past year, in line with historical trends. Small, Economy Class hotels represent the majority of hotel trades in the submarket.

### *Conclusion*

Los Angeles has seen a sharp drop in demand since the pandemic hit but has since started rebound upward. CoStar has forecasted an increase in demand and occupancy for the next year. With its large tourist segmentation and improving market, the Los Angeles hotel market should thrive for the foreseeable future and continue to attract hotel investors.

459 COLYTON STREET                                                                          *28*
LOS ANGELES, CALIFORNIA

## MARKETING AND EXPOSURE TIME

The reasonable marketing time is defined as, "An estimate of the amount of time it might take to sell a property interest in real estate at the estimated market value level during the period immediately after the effective date of value[5]". This differs from the definition of exposure time which is as follows: "The estimated length of time the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal; a retrospective estimate based upon an analysis of past events assuming a competitive and open market[6]".

Both time periods can be based on statistical information, information gathered through sales verification, and interviews with market participants. However, the marketing time requires an estimate of anticipated changes in market conditions. Whereas, the exposure time is a retrospective estimate, that is based on past events. These events are substantiated by related facts in the appraisal process, which include supply and demand conditions, current cost information, the analysis of historical sales information, and the future income expectancy from the date of value. The appraiser included five closed sales in the Sales Comparison Approach. The comparables reflect a marketing period of 3 to 13 months. We interviewed brokers in the area who indicated that typical marketing times tend to range between 6 and 9 months.

As further support, the Appraiser has examined the *PwC Investors Survey[7]*, which indicates that the marketing times for Los Angeles office market range between 1 and 12 months with an average of 6.0 months. The Pacific Region apartment market range between 1 and 9 months with an average of 3.9 months. National Full-Service Lodging segment range between 1 and 12 months with an average of 6.9 months. Given the current market conditions, the marketing time for the subject property is estimated to be within a six (6) to nine (9) month period.

After considering the aforementioned data in the determination of "marketing time" and "exposure time" for the subject property, the appraiser is of the opinion that in this instance, exposure and marketing are effectively equivalent or six (6) to nine (9) month periods.

---

[5] Appraiser News, Page 9 and 10; Volume 3 No.2; February, 1993
[6] Appraiser News, Page 9 and 10; Volume 3 No. 2; February, 1993
[7] PwC  Real Estate Investor Survey, 4th Quarter 2022

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**

*29*

## ZONING

### Zoning Classification

According to information obtained from the Los Angeles City Planning Department, the subject site is zoned C2-2 (Commercial Zone), M3-1 (Heavy Industrial), RIO (River Overlay District).



### Permitted Uses (C2)

The C2 zoning allows for most retail, office and residential uses including hotels, hospitals, theater, churches and schools.

### Permitted Uses (M3)

Most industrial manufacturing and warehousing uses including food, textile, metal lumber, wood, leather, chemical products, machinery, electrical equipment and service to selected commercial uses are permitted uses within the M3 zone classification. Additionally in 1981, the City of Los Angeles passed its "Artist in Residence" or "AIR" ordinance, which allowed residential use of formerly industrial buildings with local government approval. Thus, the subject may be also be used as an adaptive re-use project that includes commercial uses.

### RIO Overlay

The RIO overlay's purpose is as follows: To support the goals of the Los Angeles River Revitalization Master Plan; Contribute to the environmental and ecological health of the City's watersheds; Establish a positive interface between river adjacent property and river parks and/or greenways;

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**                                                    *30*

## ZONING

### *RIO Overlay (Continued)*

Promote pedestrian, bicycle and other multi-modal connection between the river and its surrounding neighborhoods; Provide native habitat and support local species; Provide an aesthetically pleasing environment for pedestrians and bicyclists accessing the river area; Provide safe, convenient access to and circulation along the river; Promote the river identity of river adjacent communities; and Support the Low Impact Development Ordinance, the City's Irrigation Guidelines, and the Standard Urban Storm water Maintenance Program.

### *State Enterprise Zone*

The subject property is also located in a State Enterprise Zone, which may utilize a lower parking ratio for commercial office, business, retail, restaurant, bar and related uses, trade schools, or research and development buildings thus increasing the buildable area of the parcel which is critical in older areas of the City where parcels are small.

### *Development Standards:*

Minimum Lot Area:          5,000 SF for residential

Maximum Height:           None, maximum FAR 8:1

Required Yards:
  Front Yard:              15 foot
  Side Yard:               12 foot
  Rear Yard:               15 foot plus 1 foot for each story over 3rd

Parking:
  Required:                2.0 spaces per 1,000 square feet (per enterprise zone), 182 spaces
  Provided:                0 spaces provided (does not meet current parking standards)

### *Conclusion*

The subject property is improved with an industrial building that has been adapted for commercial uses and live/work units, which is permitted under the "AIR" ordinance established in 1981.  A review of the current development standards indicates that the existing improvements are in conformity with the regulations set by the Los Angeles City Planning Department, with the exception of parking.  The subject predates the current zoning requirements and represents a legal and non-conforming use of the site. A nonconforming building or structure, which is damaged or partially destroyed, may be restored and the occupancy or use of the building, structure or part of the building or structure, which existed at the time of the damage or destruction, may be continued or resumed, provided that the total cost of restoration does not exceed 75 percent of the replacement value of the building or structure at the time of the damage or destruction.  A permit for restoration shall be obtained within a period of two years from the date of the damage or destruction.

The subject has obtained entitlements for the new mixed use building including 129 live/work condo units, 113-room hotel, and 81,326 square feet of commercial space as of December 26, 2019 (Exhibit D).  The entitlements are an approved use based on the recent zone change that added C2 zone to the subject site.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**

## ASSESSED VALUE AND TAXES

| Fiscal Tax Year: | | 2022/2023 |
|---|---|---|
| Tax Rate Area: | | 00004 |
| Assessor's Parcel No.: | | 5163-025-009 |
| | | |
| Assessed Valuation: | | |
|   Land: | $ | 7,280,942 |
|   Improvements: | $ | 728,088 |
|   Total: | $ | 8,009,030 |
| | | |
| 2022-2023 Tax Rate: | | 1.165520% |
| | | |
| Taxes per Rate: | $ | 93,346.85 |
| Direct Assessments: | $ | 18,891.76 |
| **2022-2023 Total Taxes:** | **$** | **112,238.61** |

*Remarks*:

The property taxes are current.

The indicated 2022/2023 assessed value and taxes were retained from the Los Angeles County Auditor Controller's Office.

With the passage of Proposition 13, taxes will likely change if and when the subject property is sold or new construction is completed in the future.  At that time, the current tax rate would be applied to the subject's market value, plus any direct assessments.

In June, 1978, the California voters approved the Proposition 13 Amendment to the California State Constitution, whereby the maximum annual tax on real property is limited to one percent of market value, plus an additional sum to pay for indebtedness on affected property approved by voters prior to the passage of the Proposition.  This may increase annually by a maximum of two percent.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**                                                    *32*

---

## SITE DESCRIPTION

The description of the subject site is based upon both a visual inspection conducted on January 17, 2023 and an examination of the applicable plat map for the subject property.

| | |
|---|---|
| Location of Property: | North side of 5th Street between Colyton Street and Seaton Street, in the City and County of Los Angeles, California |
| Property Address: | 459 Colyton Street<br>Los Angeles, CA 90013 |
| Property Status: | Entitled Land.  Existing improvements to be razed in favor of proposed mixed-use development. |

References:
  Assessor's Parcel Number:     5163-025-009
  Census Tract No.:             2060.31
  TBG Guide (Page/Grid):        634/G5 (Los Angeles County)

Site Description:
  Total Site Area:              45,721± SF or 1.05± acres
  Shape:                        Rectangular
  Site Dimensions:              Provided in plat map following this section
  Topography:                   Level and at street grade
  Zoning:                       C2-2, M3-1 -RIO, City of Los Angeles
  Case Number:                  CPC-2016-4475-GPA-VZC-HD-MCUP-CUX-DB-SPR
  Easements:                    No Atypical Easements

Street Frontage:
  Colyton Street:               152± linear feet
  5th Street:                   300± linear feet
  Seaton Street:                152± linear feet

| | |
|---|---|
| Soil Conditions: | No soil report was submitted for review; however, soil conditions are assumed to be adequate and of sufficient load-bearing capacity to warrant improvement.  Upon inspection the appraiser did not evidence atypical drainage problems. |
| Property Access: | The subject is built lot line to lot line and there is no onsite access. |
| Utilities: | All necessary utilities -- including water, sewer, electricity, gas and telephone -- are provided to the site.  All services are reportedly adequate to service needs of the subject property. |

Street Improvements:

| Street Improvement Summary | | | | | | |
|---|---|---|---|---|---|---|
| **Arterial** | **Width** | **No. of Lanes** | **Asphalt Paved** | **Sidewalks/ Curbs** | **Gutters** | **Direction of Travel** |
| Colyton St | 60± Ft. | 2 | Yes | Yes | Yes | N/S |
| 5th St. | 60± Ft. | 2 | Yes | Yes | Yes | N/S |
| Seaton Street | 60± Ft. | 2 | Yes | Yes | Yes | E/W |
| Note:  Number of lanes includes both directions of travel. | | | | | | |

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**                                                    *33*

## SITE DESCRIPTION

| | |
|---|---|
| Site Improvements: | As previously mentioned, the subject is built lot line to lot line. |
| Building Improvements: | The subject property is improved with a multi-tenant, two-story, mixed construction building consisting of brick, block and wood frame.  Please see "Description of the Improvements" for more detail. |

Neighboring Developments:

| Direction | Type of Development |
|---|---|
| North | Industrial with adaptive reuse of building |
| South | Industrial with adaptive reuse of building |
| East | Industrial with adaptive reuse of building |
| West | Industrial with adaptive reuse of building |

| | |
|---|---|
| Hazard Zoning: | *Flood Zone* - Community Map/Panel No. 06037C-1636G dated December 21, 2018.  The subject site is located within Flood Zone X.  Zone X is an area of minimal flood hazard, where flood insurance is not typically required. |
| | *Seismic Hazard* - The site is not located within a seismic Special Study zone. |
| Easements and Encroachments: | There does not appear there are any adverse easements or encroachments that would have a detrimental effect on the market value or marketability of the subject |

### *Conclusion*

Based upon the physical and functional characteristics of the site comprising the subject property, it is considered adequate for development in accordance and conformity with surrounding uses, as well as the existing improvements.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**

*34*

## PLAT MAP



## AERIAL PHOTO



**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**

*35*

## FLOOD MAP



## SEISMIC MAP



**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**

## DESCRIPTION OF THE IMPROVEMENTS

The description of the improvements is based upon an exterior inspection of the property conducted on January 17, 2023. The subject consists of one, two-story commercial building that has mixed construction consisting of brick, block and wood frame. The building has been seismically retrofitted and contains 91,200± gross/rentable square feet. The net rentable area per the rent roll is in direct correlation with the appraiser's measurements and the assessor's building size of 91,200 square feet. The existing improvement was built circa 1908, and is in average condition. Originally built for industrial use, this property is located in the "Arts District" of Los Angeles, and has been converted to commercial use on the ground floor and live work/creative office space upstairs. The owners have received entitlements (Exhibit D) for a mixed-use development consisting of 129 live/work condo units, 113-room hotel and 81,326 square feet of commercial space. The entitlements reflect a total building area of 370,340 square feet and results in an FAR of 8.1 to 1, which is much higher than current ratio of 2 to 1 for the existing improvements. The highest and best use analysis suggests that the subject should be demolished in lieu of the proposed mixed-use development that will maximize the utility of the site. The improvements are constructed on a site that encompasses 45,721± SF or 1.05± acres. A more detailed description of the subject improvements is presented below.

Based on the age/condition and entitlements, the subject does not have any remaining economic life. It is important to note that the owners have received a demolition permit (20019-1000-03834) on October 17, 2022.

### *Detailed Building Description*

| | |
|---|---|
| Current Use: | Multi-tenant commercial building |
| Building Improvements: | |
|   Gross/Net Rentable Area (SF): | 91,200 SF |
|   Occupancy: | 0.0% |
|   Year Built: | 1908 |
|   Actual Age: | 115 years |
|   Economic Life: | 60 years |
|   Effective Age: | 60 years |
|   Remaining Economic Life: | 0 years |
|   Construction Type: | Mixed - brick, block and wood frame |
|   Building Class: | C |
|   Quality/Condition: | Average/Average |
|   Parking: | None |
| Foundation: | Concrete slab |
| Entry Doors: | Glass in metal frames |
| Exterior Walls: | Masonry |
| Windows: | Windows in metal frames |
| Roof: | Rolled composition cover over built-up roof system |
| Flooring: | Mix of polished concrete, hard wood and tile primarily in the bathrooms |

**459 Colyton Street**
**Los Angeles, California**

## DESCRIPTION OF THE IMPROVEMENTS

### *Detailed Building Description (Continued)*

| | |
|---|---|
| Interior Partitions: | Drywall |
| Restrooms: | There are multiple restrooms both on the ground floor and second floor of the building. |
| Ceilings: | Mostly exposed beam ceiling with some dropped acoustic tile ceiling with recessed fluorescent lighting in common area corridors. |
| Lighting: | Both ceiling suspended fluorescent and incandescent light fixtures. There are also some ceiling fans. |
| HVAC: | Heating and air conditioning only on ground floor level. Second floor some units with climate control. |
| Elevator: | None |
| Stairwells: | Interior stairwells provide vertical access |
| Fire Sprinklers: | Yes, throughout the entire building |
| Utilities: | Services are adequate for existing uses. |
| Accessibility: | Locally via Alameda and 6th Streets and regionally via the 101, 110, Interstate 5 and Interstate 10 Freeways. |
| Parking Lot and Driveways: | Not applicable |
| Sidewalks: | None |
| Landscaping: | None |
| Environmental Hazards: | None noted |
| American Disabilities Act (ADA): | The ADA places development constraints on commercial properties so that disabled persons may more easily access them. Many of the issues pertaining to the ADA are subject to legal interpretation, so no warranty of compliance is given or implied. |
| Functional Obsolescence: | Only some units have climate control on the second floor and there is little if any building insulation. |
| Deferred Maintenance: | Deferred maintenance was noted in the live/work units that were inspected. Any existing deferred maintenance will not affect the marketability of the subject since the highest and best use suggests that the improvements be razed in favor of the proposed development. |

### *Conclusion*

In summary, the improvements have average quality construction and are adequate for the current multi-tenant uses. Although the improvements have been adequately maintained over the years, there is no remaining economic life since the highest and best use analysis suggests that the subject should be demolished in lieu of the proposed mixed-use development.

# Building Sketch

| Borrower/Client | | | | |
|---|---|---|---|---|
| Property Address | 459 Colyton Street | | | |
| City | Los Angeles | County | State CA | Zip Code |
| Lender | | | | |

Second Floor

Ground Floor

TOTAL Sketch by a la mode, inc.

**Area Calculations Summary**

| Living Area | |
|---|---|
| Ground Floor | 45600 Sq ft |
| Second Floor | 45600 Sq ft |
| **Total Living Area (Rounded):** | **91200 Sq ft** |

459 COLYTON STREET                                                                    *38*
LOS ANGELES, CALIFORNIA

## HIGHEST AND BEST USE
### As Vacant

The theory of highest and best use is fundamental to the concept of value.  Highest and Best Use is defined as follows:

> *The reasonably probable and legal use of vacant land or an improved property, that is physically possible, appropriately supported and financially feasible and that results in the highest value.  The four criteria the highest and best use must meet are legal permissibility, physical possibility, financial feasibility, and maximum profitability.*[8]

The following tests must be met in estimating the highest and best use: The use must be legal. The use must be probable, not speculative or conjectural.  There must be a profitable demand for such use and it must return to the land the highest net return for the longest period of time. These tests have been considered in the following sections.

### *Physically Possible*

The size, shape, location, utility, and terrain impose physical restraints upon the type of uses possible for the subject property.  Any use incompatible with the constraints imposed by the various physical constraints of the site would not be considered physically possible.

The subject consists of one parcel that encompasses 45,721± square feet, or 1.05± acres.  The site is situated within the "Arts District" of Downtown Los Angeles.  The subject site is generally level, at street grade, and drainage appears adequate for typical storm water run-off.

The site has a rectangular shape that is suitable for most types of development.  Accessibility to the site is also good via several local freeways including Interstates 5, 10 and 101.  The site has all necessary utilities available, and they are all adequate for most types of improvements.

No soils report was reviewed, however, soil conditions are assumed to be adequate and of sufficient load bearing capacity to warrant improvement.  In addition, the property is assumed encumbered with typical utility easements.  The property is in Flood Zone X, which is an area of minimal flood hazard.  It is also not located within a seismic special study zone.  The size of the site and other physical characteristics allow for good flexibility in development.  Based on the property's physical characteristics, there are a variety of uses that could be developed on the subject site.

### *Legally Possible*

The subject property is zoned C2-2, M3-1 -RIO by the City of Los Angeles Planning Department. This zoning allows most retail, office and residential uses.  Thus, all uses compatible with the zoning requirements and approved by the City planning department would be considered legally permissible. The subject has received entitlements for a new mixed use development consisting of 129 live/work condo units, 113-room hotel and 81,326 square feet of commercial space.  The entitlements reflect a total building area of 370,340 square feet and results in an FAR of 8.1 to 1.

---

[8] *The Appraisal of Real Estate,* Twelfth Edition, Appraisal Institute, 2001, Page 305.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**

*39*

## HIGHEST AND BEST USE
As Vacant

### *Financially Feasible and Maximally Productive Use*

After noting the physically possible and legally permissible uses of the site, the topic of financial feasibility must be addressed. Any use of the site that provides a positive financial return to the land in excess of that required to satisfy operating expenses, financial expenses and capital amortization is considered financially feasible. The cost of the land sets a lower limit upon those uses, which are financially feasible for the site.

The subject has a desirable location in the "Arts District" of Los Angeles. The Los Angeles City Planning Commission has approved the subject for a mixed-use building including 129 live/work condominium units, a 113 room hotel and 81,326 square feet of commercial space for art galleries, retail, restaurant and artist collaborative space (Exhibit D). Since it will have 15 units set for Very Low Income households, the project got approved for additional density bonus which allowed for FAR of 8:1. Rental rates for newer retail space ranges from $2.50 to as much as $5.40/SF/Month, modified gross and $2.12 to $3.98/SF/Month for live/work units. Therefore, in keeping with conformity to surrounding uses and the C2-2, M3-1 -RIO zoning allowed uses, the appraiser is of the opinion that the Highest and Best Use of the subject site "as vacant" is for a mixed use retail, residential and hotel development.

### *Conclusion*

In conclusion, and based upon an analysis of the zoning code, neighborhood environs, and current market conditions, the appraiser is of the professional opinion that the highest and best use of the subject site, as vacant, would be for the entitled mixed-use development.

459 COLYTON STREET                                                                    *40*
LOS ANGELES, CALIFORNIA

## HIGHEST AND BEST USE
### As Improved

When considering the highest and best use, as improved, the appraiser must determine whether the existing improvements are maximally productive or whether an addition, change in use, or demolition would yield a higher return.

The subject consists of one, two-story commercial building that has mixed construction consisting of brick, block and wood frame. The building has been seismically retrofit and contains 91,200± gross/rentable square feet. The existing improvement was built circa 1908, and is in average condition. Originally built for industrial use, this property is located in the "Arts District" of Los Angeles, and has been converted to commercial use on the ground floor and live work/creative office space upstairs. As of the date of value, the subject is 100% vacant according to Mr. Kevin Chen. During our inspection Unit 451 (Admere Liquidations) was occupying their space. It was further stated by Mr. Chen that the tenant is in the process of selling or removing the remaining merchandise. The improvements are constructed on a site that encompasses 45,721± SF or 1.05± acres.

The subject has a desirable location in the "Arts District" of Los Angeles and has been approved by the Los Angeles City Planning Commission for a mixed-use building. The proposed project will include 129 live/work condominium units, a 113 room hotel and 81,326 square feet of commercial space for art galleries, retail, restaurant and artist collaborative space (Exhibit D). This equates to an FAR of 8:1 due to the inclusion of 15 units set for Very Low Income households that increased the density of the project.

The first consideration is an addition. An addition may be warranted when there is sufficient market demand or when an existing use requires expansion space. At this time, the property is fully improved with the building which is built to the lot lines. Therefore, an addition, to the property is not likely.

A second consideration is a change in use. In this instance, the useful life of the existing improvements has been exhausted and the improvements are intended to be cleared from the site to make room for the proposed development.

The last consideration is demolition of the improvements. Demolition of the existing improvements is the most common way to acquire land useable for alternate improvements. Upon demolition, a new structure could be built based upon the current allowable zoning. As previously mentioned, the Arts District continues to be an area of transition. Existing industrial buildings are being purchased for proposed higher density, multi-story projects. This is evident by the number of on-going or projects that are in the pipeline. The subject has entitlements in place for a high density project that will contain an FAR of 8:1, which is much higher than the current 2:1. Based on the entitled FAR, the site is underutilized. As of the date of value, the subject is 100% vacant with the exception of Unit 451, which is in the process of vacating. The subject was completed in 1908 and has exhausted its useful life. Due to the age of the improvements and current occupancy, leasing up of the subject this point would require extensive retrofit and renovation and would not be feasible. Additionally, the owners have received a demolition permit and are ready to begin demolition. Therefore, it is our opinion that the highest and best us of the site as improved is to demolish the existing structure to make way for new development.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**

*41*

## HIGHEST AND BEST USE
As Improved

*Conclusion*

The existing improvement is an older, two story commercial and live/work building. The floor area ratio 2:1 is significantly less than the maximum 8:1 FAR permitted by the new entitlements. Considering the fact that the land is zoned for a higher density development and the parcel is capable of supporting a larger development than the existing building, it appears that the existing mixed use building represents an underutilization of the site. Based on the subject's location in the Downtown Los Angeles submarket, coupled with the close proximity to transportation, employment centers and necessary services, the existing improvements do not represent the highest and best use of the site as improved. Thus, the subject's highest and best use would be to raze the existing improvements in favor of a higher density mixed-use project consisting of 129 live/work condominium units, a 113 room hotel and 81,326 square feet of commercial space. The most probable buyer is an institutional investor/developer.

459 COLYTON STREET                                                                                       *42*
LOS ANGELES, CALIFORNIA

## VALUATION PROCESS

The purpose of this appraisal assignment is to estimate the "As-Is" Market Value as of the date of value.  There are three traditional approaches utilized in the valuation of income producing property such as the subject, the Cost, Income and Sales Comparison Approaches.  The Cost approach is based on the principle of substitution under the assumption that an informed buyer would pay no more than the cost of reproducing a substitute property with the same utility as the subject property.  This process involves estimating the reproduction or replacement cost of new improvements, deducting accrued depreciation and adding the estimated land value.  This method is particularly applicable when the property being appraised involves relatively new improvements which represent the highest and best use of the land or when unique or specialized improvements are located on the site and for which there exists a limited amount of comparable properties in the market.

For the purposes of this report, the Cost Approach is not applicable in deriving market value indications.  The validity of the estimate of value via the Cost Approach is not credible in this instance due to age of the improvements and the difficulty in accurately estimating the amount of accrued depreciation.  Furthermore, investors of properties such as the subject indicate that the Cost Approach is not relied upon for purchasing decisions.  The elimination of the Cost Approach does not impede the ability to value the subject property.  Therefore, this technique will not be included in this appraisal since the highest and best use analysis suggests that the subject should be demolished in lieu of the proposed mixed-use development.

The Income Capitalization Approach converts the property's projected future benefits of ownership into a present value estimate.  For the typical investor, these future benefits generally take the form of income received periodically over the investment period, as well as, a recovery of the initial investment, plus any appreciation, or minus any depreciation, that may be realized at the time of disposition.  This approach attempts to simulate the most probable buyer's investment decisions in estimating a reasonable purchase price.  Investigations into market rental rates and investor investment criteria, extracted from other recent sales and published surveys, aid in choosing the correct assumptions for this process.  Since the highest and best use analysis suggests that the subject should be demolished in lieu of the proposed mixed-use development and the income approach was excluded in this analysis.

The Sales Comparison Approach is based upon the analysis of other recent comparable property sales within the marketplace.  This approach will present land sales considered to be of similar property type.  These sales provide an independent estimate of market value on a per unit comparison level.  This approach is predicated on sufficient market activity among similar properties to make comparisons to the subject property.

The final step in estimating market value is to correlate the approaches used and consider the importance of each approach and the relation to the actions of the typical investor in the market.  In my opinion, there is an adequate amount of comparable land sales.  Individual investors, partnerships own the majority of properties similar to the subject.  The valuation of the subject begins with the Sales Comparison Approach on the following page.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**                                                                 *43*

## SALES COMPARISON APPROACH

The Sales Comparison Approach is essential in almost every real estate appraisal. The value estimated by this approach frequently is defined as:

"The price at which a willing seller would sell and a willing buyer would buy, neither being under abnormal pressure."

This definition assumes that both buyer and seller are fully informed as to the property and state of the market for that type of property, and that the property has been exposed in the open market for a reasonable amount of time.

The application of this approach produces an estimate of value of property by comparing it with similar properties of the same type and class, which have been sold recently in the same or competing areas. The comparative processes utilized in determining the degree of comparability between two properties involves judgment as to their similarity with respect to many value factors such as location, construction, entitlement status, land size, cost to complete, views, number of units, etc. The analysis and correlation of the analysis results in an estimated value which represents the probable price at which the subject would be sold by a willing seller to a willing buyer, as of the date of the appraisal.

As mentioned earlier, the subject has received entitlements for a new mixed use development consisting of 129 live/work condo units, 113-room hotel and 81,326 square feet of commercial space. The entitlements reflect a total building area of 370,340 square feet and results in an FAR of 8.1 to 1. There are very few sales in the market that contain a similar unit mix. Therefore, analyzing the subject on an FAR basis is appropriate. In this appraisal, we will adjust the land sales based on the price per FAR square foot of each comparable. A search for land sales that would allow similar FAR developments within the Downtown Los Angeles market was performed. This search revealed five comparable sales that exhibited similar development potential. Details of these land sales are presented on the following pages.

**459 COLYTON STREET**
**LOS ANGELES, CALIFORNIA**

*44*

# SALES COMPARISON APPROACH

**Land Sales Adjustment Grid**
**Commercial Land Sales**

| Comparable No. | Subject | Comp. 1 | Comp. 2 | Comp. 3 | Comp. 4 | Comp. 5 |
|---|---|---|---|---|---|---|
| Property Address | 459 Colyton Street | 2130 Violet St. | 1130 S Hope | 1411 S Flower St | 1001 W Olympic Bl | 1206-1338 E 6th St/1205-1321 Wholesale St |
| City | Los Angeles, CA | Los Angeles, CA | Los Angeles, CA | Los Angeles, CA | Los Angeles, CA | Los Angeles, CA |
| APN | 5163-025-009 | 5166-004-027 | 5139-021-004 | 5134-009-007, 008 | 5138-006-007, 008, 009, 014, 020, 021, 022, 023, 024 | 5164-010-003, 004, 005 |
| Distance From Subject | N/A | 0.75± mile southeast | 1.5± miles west | 1.75± miles west | 1.75± miles west | 0.25± miles south |
| Confirmation | N/A | Costar, Public Records, Media | Costar-public Records | John Eichler-Cushman & Wakefield | Mark Tarczynski-Colliers International | Costar-public Records |
| Property Rights | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple | Fee Simple |
| Status | Entitled | Entitled | Unentitled | Unentitled | Entitled | Unentitled |
| Zoning | C2-2, M3-1 | (T)(Q)M3-2D-RIO | [Q]R5-4D-O | C2-2D | C2-4D | M3 |
| Intended Use | Mixed-use development | Nine-story office building | Hotel | Mixed-use (Apt/Retail) | Mixed-use (Apartments/Retail) | Proposed production studios |
| Utilities Available | All Available | All Available | All Available | All Available | All Available | All Available |
| Off-site Improvements | All in place | All in place | All in place | All in place | All in place | All in place |
| On-site Improvements | Two, story, mixed-use building | Industrial buildings | Vacant Lot | None | None | Previously developed |
| Lot Shape | Generally rectangular | Generally rectangular/Good | Generally rectangular/Good | Generally rectangular/Good | Irregular | Rectangular/Good |
| Corner/Interior | Two corners | Interior | Interior | Interior | Interior/4 street frontage | Interior |
| Topography | Generally Level | Generally Level | 0 | Generally Level | Generally Level | Generally Level |
| Easements | Typical Utilities | Typical Utilities | Typical Utilities | Typical Utilities | Typical Utilities | Typical Utilities |
| Deed Restrictions | None | None | None | None | None | None |
| Land Area (Ac.) | 1.05 | 0.74 | 0.18 | 0.36 | 3.26 | 14.60 |
| Land Area (SF) | 45,721 | 32,222 | 7,732 | 15,516 | 141,962 | 635,920 |
| FAR (SF) | 370,340 | 113,000 | 46,392 | 93,096 | 1,845,831 | 721,100 |
| FAR | 8.1:1 | 3.5:1 | 6:1 | 6:1 | 13:1 | 1.13:1 |
| Sale Date | N/A | July-20 | March-20 | September-20 | November-19 | May-22 |
| Days on Market | N/A | 0 | 574 days | 0 | N/Av. | Not Available |
| Document/Record Number | N/A | 20-0755687 | 20-0279356 | 20-1087286 | 19-1313559 | 22-0517360 |
| Seller | N/A | Violet Street Investors LLC | BIMHF LLC | Auth Family Trust | California Primary Physicians Prop. Grp | Sixth & Alameda LLC |
| Buyer | N/A | Violet QOZB Owner LLC | Hope Street 1 LLC | 1411 S Flower Qozb LLC | LA Gateway | Alameda Studio Owner LLC |
| Sale Price | N/A | $17,900,000 | $6,500,000 | $8,600,000 | $121,100,500 | $240,000,000 |
| Financing | All Cash | Conventional | Conventional | Conventional | Conventional | Conventional |

Comments:

The subject site is a rectangular shaped parcel with frontage on three streets. It is improved with a two-story, commercial building containing commercial use on the ground floor and five work/creative office on the second floor. As of the date of value, the subject has received entitlements for a mixed use building that will include 129 live/work condo units, 113-room hotel, and 81,326 square feet of commercial space . As proposed the project will contain 370,340 SF or an FAR of 8.1:1.

The comparable represents a land sale that was entitled at time of sale for a 9-story mixed use building containing ground floor retail, 5 levels of above ground parking, four levels of office and rooftop amenity. The property was that will contain ground floor retail, 2nd floor improved at time of sale with industrial buildings; however, no value was placed on the improvements.

This property is located in the South Park Neighborhood near L.A. Live. The property sold unentitled but the buyer has submitted plans for an 12-story hotel with basement, automatic robotic parking system and 144 guest rooms on remaining floors.

This property is located in the southern boundaries of South Park Neighborhood, just north of Interstate 10. The property sold with unentitled and the only plans submitted as of the date of value are for demolition of existing property containing commercial and residential apartment units.

The comparable consists of 9 contiguous parcels that are located just north of LA Live and were entitled for three-towers that will contain a combined area of 1,845,831 square feet. The mixed-use project will consists of a 43-story building containing 1,000 hotel rooms, a 53-story building containing 363 residential units, and a 53-story building that will contain 516 residential units. In addition, the development will include 40,000 square feet of restaurant and retail uses as well as 106,000 square feet of open space.

This property is a recent sale of two adjacent properties. The comparable was unentitled at time of sale; however, the buyer is proposing sound stages on the site that will be known as East End Studios. The proposed development will include 321,520 SF of studio space across 16 soundstages, 292,310 SF of creative office, and 106,570 SF of production support space. It will also provide parking for 1,327 spaces cars in a mostly underground garage. The proposed project will reflect an FAR of 721,100 SF.

## ADJUSTMENTS

| | Subject | Comp. 1 | | | Comp. 2 | | | Comp. 3 | | | Comp. 4 | | | Comp. 5 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sale Price | N/A | $17,900,000 | | | $6,500,000 | | | $8,600,000 | | | $121,100,500 | | | $240,000,000 | | |
| Sale Price/ FAR | N/A | $158.41 | | | $140.11 | | | $92.38 | | | $65.61 | | | $332.82 | | |
| Property Rights | Fee Simple | Fee Simple | 0.0% | $158.41 | Fee Simple | 0.0% | $140.11 | Fee Simple | 0.0% | $92.38 | Fee Simple | 0.0% | $65.61 | Fee Simple | 0.0% | $332.82 |
| Financing Terms | All Cash | Conventional | 0.0% | $158.41 | Conventional | 0.0% | $140.11 | Conventional | 0.0% | $92.38 | Conventional | 0.0% | $65.61 | Conventional | 0.0% | $332.82 |
| Conditions of Sale | N/A | Demo. | 0.0% | $159.76 | None | 0.0% | $140.11 | None | 0.0% | $92.38 | Demo. | 1.5% | $66.62 | Demo. | 1.6% | $338.31 |
| Market Conditions | 1/17/2023 | Jul-20 | 19.0% | $190.11 | Mar-20 | 21.5% | $170.23 | Sep-20 | 18.0% | $109.01 | Nov-19 | 24.0% | $82.60 | May-22 | 0.0% | $338.31 |
| Location | Good | Similar | 0.0% | | Similar | -5.0% | | Inferior | 10.0% | | Superior | -15.0% | | Similar | 0.0% | |
| **Physical Characteristics** | | | | | | | | | | | | | | | | |
| Zoning | C2-2, M3-1 | (T)(Q)M3-2D-RIO | 0.0% | | [Q]R5-4D-O | 0.0% | | C2-2D | 0.0% | | C2-4D | 0.0% | | M3 | 0.0% | |
| Entitlements | Entitled | Entitled | 0.0% | | Unentitled | 30.0% | | Unentitled | 30.0% | | Entitled | 0.0% | | Unentitled | 30.0% | |
| Utilities | All Available | All Available | 0.0% | | All Available | 0.0% | | All Available | 0.0% | | All Available | 0.0% | | All Available | 0.0% | |
| Off-Sites | All in place | All in place | 0.0% | | All in place | 0.0% | | All in place | 0.0% | | All in place | 0.0% | | All in place | 0.0% | |
| Shape/Utility | Generally rectangular | Generally rectangular/Good | 0.0% | | Generally rectangular/Good | 0.0% | | Generally rectangular/Good | 0.0% | | Irregular | 0.0% | | Rectangular/Good | 0.0% | |
| Topography | Generally Level | Generally Level | 0.0% | | 0 | 0.0% | | Generally Level | 0.0% | | Generally Level | 0.0% | | Generally Level | 0.0% | |
| FAR Area (SF) | 370,340 | 113,000 | -15.4% | | 46,392 | -19.4% | | 93,096 | 0.0% | | 1,845,831 | 100.0% | | 721,100 | 21.0% | |
| Cumulative Adj. Total | | | -15.4% | | | 5.6% | | | 23.4% | | | 85.0% | | | 51.0% | |
| Adjusted Price/ SF | | | $160.76 | | | $179.70 | | | $134.48 | | | $152.82 | | | $511.01 | |

# COMPARABLE LAND SALES MAP



Copyright © and (P) 1988–2012 Microsoft Corporation and/or its suppliers. All rights reserved. http://www.microsoft.com/streets/
Certain mapping and direction data © 2012 NAVTEQ. All rights reserved. The Data for areas of Canada includes information taken with permission from Canadian authorities, including: © Her Majesty the Queen in Right of Canada, © Queen's Printer for
Ontario. NAVTEQ and NAVTEQ ON BOARD are trademarks of NAVTEQ. © 2012 Tele Atlas North America, Inc. All rights reserved. Tele Atlas and Tele Atlas North America are trademarks of Tele Atlas, Inc. © 2012 by Applied Geographic Solutions. All
rights reserved. Portions © Copyright 2012 by Woodall Publications Corp. All rights reserved.

# PLAT MAP OF COMPARABLE LAND SALES



**Sale No. 1- 2130 Violet St., Los Angeles, CA**

**Sale No. 2- 1130 S Hope, Los Angeles, CA**



**Sale No. 3- 1411 S Flower St, Los Angeles, CA**



**Sale No. 4- 1001 W Olympic Bl., Los Angeles, CA**



**Sale No. 5- 1206-1338 E 6th St, Los Angeles, CA**

## SALES COMPARISON APPROACH

### *Discussion & Adjustments to Sales*

A search of the Downtown Los Angeles market resulted in four land sales and one active listing that were intended for large-scale developments. The comparable sales that have been presented are relatively similar to the subject and are located within a two-mile radius of the subject property.

The sales presented are the most recent in the area, and are the most comparable in terms of density. They exhibit an FAR range between 46,392 and 1,845,831 square feet and reveal a rather large unadjusted price per FAR square foot range between $65.61 and $332.82 per square foot. The subject has a maximum entitled FAR of 370,340± square feet per the zoning code. The comparable land sales transpired between November 2019 and May 2022.

The land areas of the comparable sales range in size between 7,732± square feet and 635,920± square feet. In comparison, the subject land area encompasses approximately 45,721± square feet of land. Therefore, in order to derive an estimate of value for the subject, the comparable land sales will be analyzed on a price per FAR foot basis. A discussion of each sale and the necessary adjustments required for each is presented in the discussion below. The land sales will be adjusted for property rights conveyed, financing, conditions of sale, market conditions, location and various physical characteristics including site size, lot shape/utility, topography, utility availability, zoning/density, corner/interior lot and accessibility. Only those characteristics requiring adjustment will be discussed below.

### *Property Rights Conveyed*

The first element of comparison is real property rights conveyed. This is important because the type of real property rights conveyed will greatly influence the selling price of the property. The value estimate of the subject land is based on a fee simple estate. The comparable properties involve fee simple title and are, equivalent in this regard. No adjustment for property rights is needed.

### *Financing*

The selling price of a property may vary from that of an identical property if financing arrangements are different or atypical. Since the subject is under analysis on the basis of a cash or market financing transaction, it is necessary to analyze the financing terms of the comparable sites to identify any abnormal financing which may have influenced the selling prices. In this instance, the sales sold on an all cash or equivalent basis. No adjustment for financing was made to the sales.

### *Conditions of Sale*

Adjustments for conditions of sale are made when the buyer or seller had atypical motivations. Examples of transactions, which might require a condition of sale adjustment, are distressed sales, auctions, eminent domain processing, sales that required demolition, and sales that were not arm's length. For the purpose of this analysis, the subject land is appraised as though vacant and in rough graded condition. Since land is valued as vacant, those sales that occurred with existing improvements that required demolition will receive appropriate upward adjustment. In this instance, three of the five comparables were

## SALES COMPARISON APPROACH

### *Conditions of Sale (Continued)*

improved with structures at the time of sale and required an adjustment for demolition costs. Based on the *Marshall & Swift Building Cost Guide*, demolition costs typically range from $5.52 to $10.20 per square foot, depending on the building class. We have considered a cost of $10.00/SF to which we applied 25% profit to arrive at a total demolition cost with profit of $12.50/SF. The calculation for the necessary demolition is shown below.

| Demolition Cost Adjustment | | | | |
|---|---|---|---|---|
| Sale No. | Building (SF) x | Demo Cost ÷ | Sale Price | = Total Adj. |
| 1 | 12,214 | $152,675 | $17,900,000 | 0.9% |
| 4 | 149,032 | $1,862,900 | $121,100,500 | 1.5% |
| 5 | 316,632 | $3,957,900 | $240,000,000 | 1.6% |

*Numbers may be off due to rounding*

As can be seen from the table above, an overall adjustment of 0.9% to 1.6% was applied.

### *Market Conditions*

Although market conditions usually change over time, the date of appraisal is as of a specific date. Therefore, if there are significant changes in the market conditions between the time when a property sold and the date of value for the appraisal, than an adjustment is warranted. In this instance, the comparable sales transpired between November 2019 and May 2022. It should be noted that because the area is nearly fully developed, vacant commercial land is scarce. Thus, there is a limited number of current land sales. Additionally, due to the most recent economic conditions as a result of the COVID-19 pandemic resulted in a brief slowdown in transactions. The comparables utilized appear to be the best available sales uncovered in the local market.

In examining sales trends and in speaking with other real estate professionals who work in Los Angeles County, the appraiser discovered that commercial land sale prices in the Downtown Los Angeles market have been increasing; however, not at the same pace prior to the recent pandemic. Developers have been buying up underutilized industrial, residential and commercial zoned sites for redevelopment. As previously mentioned, few sales have occurred in the DTLA market over the past three years. As a result, there were too few sales to determine a credible market condition adjustment. Instead, the appraiser reviewed CoStar Market Reports for the retail, apartment and hospitality DTLA markets. The appraiser used these three surveys since the entitled land is approved for each use. The table below summarizes the change in average sale price and rents/ADR increase between 2021 and 2022 for each component.

| Downtown Los Angeles | | |
|---|---|---|
| | Sales | Rent/ADR |
| Retail | 4.18% | 2.90% |
| Apartments | 2.83% | 0.20% |
| Hotel | 1.55% | 29.19% |

*Source: CoStar*

These trends represent the overall DTLA market. Within the subject's "Arts District," Sale 5 represents a recent sale located approximately ¼-mile from the subject that previously sold in

## SALES COMPARISON APPROACH

### *Market Conditions (Continued)*

March 2015 for $130 million and then recently sold for $240 million in May 2022.   This represents an increase in value of 84.6% or 14.1% over a six year period.   Based on the data presented, the appraiser is justified in applying a tempered annual increase of 7.5% to those sales that transpired more than 9 months from the date of value.   This results in an upward adjustments of 19.0% to Sale 1, 21.5% to Sale 2, 18% to Sale 3 and a 24% upward adjustment to Sale 4.

### *Location*

The subject is situated in the City of Los Angeles, within the Arts District of Downtown Los Angeles.   Sale 1 is situated just south of the subject in the same competitive area.   As such, no adjustment is required.   The remaining sales are located in close proximity to LA Live and Staples Center.   As a result, this location is a desirable place for commercial tenants, residents or hotel operators.   The appraiser attempted a paired sales analysis to determine an appropriate adjustment for location; however few market sales were found.   Therefore, our adjustment is based on conversations with area brokers from CB Richard Ellis, Cushman & Wakefield and Colliers International.   In addition, the appraiser compared the average asking rate of apartments within ½-mile from the subject and each of the comparables.   The survey included all apartment buildings containing more than 20 units and built after 2015.   For the purpose of this analysis, the appraiser has applied a downward adjustment of 5% to Sale 2 and a substantial downward adjustment of 15% to Sale 4, which are located near LA Live.   In comparing the average lease rates for Sale 3, an upward adjustment of 10% and 5% was applied, respectively.   No other adjustments were required.

### *Entitlements*

An entitled property is one that has received development approvals from the local governing agency.   In this instance, the subject has received entitlements as have Sales 1 and 4.   In comparison, Sales 2, 3 and 5 were not entitled at the time of sale.   We attempted to confirm the total entitlement costs for the Sales 1 and 4; however, we were unsuccessful. The costs of land entitlement vary and are property specific based on the proposed project. The premium for entitled properties reflects the time, risk and cost to entitle the property.   In addition, entitled land typically sells for a premium beyond the cost incurred.

Local developers revealed that the current entitlement premium tends to range between 10.0% to as much as 100%, depending on the project.   In order to determine an adjustment the appraiser compared a property that sold without entitlements and subsequently sold with entitlements.   In terms of the sales in the survey, this did not occur.   As such, the appraiser considered other sales in the Downtown Los Angeles market.   As an example, a property that was not included as a sale in our analysis, originally sold unentitled in October 2018 for $12,000,000 and later sold entitled in September 2019 for $13,500,000 or an increase of 12.5%.   Another property was sold in December 2018 and as the property was nearing approvals it sold in August 2019 for 33% higher.   Based on this information, the appraiser has applied a tempered upward adjustment of 30% to Sales 2, 3 and 5.

## SALES COMPARISON APPROACH

### Utilities Availability

This category reflects the condition of the subject site in terms of utilities. Since the subject is currently developed, we have assumed that the subject has all utilities to the site. All of the sales consist of land parcels with all utilities available to the site as well requiring no adjustment.

### Off-sites

The subject has paved streets, curbs and gutters. Each of the comparables also have all off-sites in place.

### Site Shape/Utility

The shape and utility of a site may affect the development potential of a property. In this case, the subject consists of a generally rectangular shaped parcel. Due to the size of the subject site and frontage on three streets, it provides good utility for development. In comparison, all of the comparables have similar utility as the subject due the overall size of the properties. As such, no adjustment was applied to the comparables.

### Topography

The subject has a level topography. Overall, the topography is considered similar to the comparables. Thus, no adjustment is required.

### FAR Area

The subject has an entitled FAR of 370,340 SF based on a ratio of 8.1:1 and a site size of 45,721 square feet. In contrast, the comparables have a FAR area of 46,392 to 1,845,831 square feet. The appraiser will apply a 3.0% adjustment for every 50,000 of FAR foot difference between the subject FAR area relative to the comparables. The adjustments for the comparables are calculated in the chart below. The adjustment is capped at 100%.

|        | Calculation |
|--------|-------------|
| **Comp 1** | [(113,000 SF – 370,340 SF) ÷ 50,000 SF] x 3.0% = -15.4% |
| **Comp 2** | [(46,392 SF – 370,340 SF) ÷ 50,000 SF] x 3.0% = -19.4% |
| **Comp 3** | [(93,096 SF – 370,340 SF) ÷ 50,000 SF] x 3.0% = -16.6% |
| **Comp 4** | [(1,845,831 SF – 370,340 SF) ÷ 50,000 SF] x 3.0% = +100.0% |
| **Comp 5** | [(721,100 SF – 370,340 SF) ÷ 50,000 SF] x 3.0% = +21.0% |

*Numbers may be off due to rounding*

Overall, the comparables received adjustments ranging from -19.4% to +100.0%.

## SALES COMPARISON APPROACH

### Conclusion of Land Value

The five land comparables exhibited varying degrees of similarity to the subject and reflect an unadjusted range of $65.61 and $172.26 per FAR foot. Adjustments were applied for conditions of sale, market conditions, location, entitlements and size. After applying the appropriate adjustments, the comparables reflect a range of $134.48 and $511.01 per FAR foot. Although each of the comparables is considered a good indicator of value for the subject; emphasis was placed on Sale No. 1 ($160.38/FAR SF) as it is the most recent sale of entitled land and is most similar in size and location. Based on the location of the subject, coupled with the entitlements in place, a value between $165.00/FAR foot and $170.00/ FAR foot would be appropriate. As such, the appraiser concludes to a value at the middle of the range or $167.50 per FAR foot.

### Land Extraction

As further support for the unit value conclusion, we also performed a land extraction of a 58-story apartment building that was completed in September 2020 and sold in November 2022. The land extraction technique is defined as follows:

> "A method of estimating land value in which the depreciated cost of the improvements on the improved property is calculated and deducted from the total sale price to arrive at an estimated sale price for the land[9]."

In performing the land extraction on the sales, the appraiser reviewed the Marshall Valuation Service – Building Cost Guide for high rise apartments. The construction Cost/SF takes into consideration various multipliers that are applied for property specific characteristics including: location, building shape, profit, etc. Presented below is the calculation of the construction costs per square foot that will be applied.

**Section 11, Page 18, Class A Good/Average**

| | |
|---|---|
| Bldg. Costs / SF | $215.00 |
| Sprinklers | $3.00 |
| HVAC Adj. | $0.00 |
| Subtotal | $218.00 |
| Story Height Adj. | 1.247 |
| Floor Area / Perimeter Multiplier | 1.00 |
| Current Cost Multiplier | 1.17 |
| Local Multiplier | 1.17 |
| Final Adjusted Base Cost | $372.13 |

Next, the appraiser applied the construction cost per square foot to the size of the building, which results in a total dollar cost for construction "as new." Depreciation will also be deducted from the cost new to arrive at the depreciated value of the improvements. The depreciated value of the improvements will then be deducted from the sale price to arrive at the implied unit value before accounting for any site improvements, permitting fees, etc. Once the existing improvements are removed, the resulting value will reflect a vacant lot. Please see the land extraction of the sale on the following page.

---

[9] _The Dictionary of Real Estate Appraisal_, 6th Edition, Appraisal Institute, 2015, Page 73.

## SALES COMPARISON APPROACH

### Land Extraction (Continued)

| | | |
|---|---|---|
| Entrepreneurial Profit | 15% | |
| Physical Life | 60 | |
| Effective Age | 2 | |
| Land Area: | 40,946 | |
| Site Costs: | $85.00 | |

| | | |
|---|---|---|
| Building Sale Price | | $504,000,000 |

| | | |
|---|---|---|
| Gross Bldg. Area (SF) | 850,000 | |
| Cost/SF of Bldg. Area | $372.13 | |

| | | | | |
|---|---|---|---|---|
| Total Cost of to Construct | | $316,310,491 | | |
| Profit (15%) | | $47,446,574 | | |
| Replacement Cost New | | $363,757,065 | | |
| Less Depreciation | 3.3% | ($12,125,235) | | |
| Depreciated Value of Improvements | | $351,631,829 | | |
| Add Dep. Site  Improvements | | $3,480,410 | | |
| Total Dep. Improvement/Site Contribution: | | | $355,112,239 | |
| Finished Lot Estimate | | | $148,900,000 | $175.18   $/FAR SF |
| | | | | $3,636   $/SF Land |

As seen from the table above, the finished lot value of the land is $148,900,000 or $175.18/ FAR foot.  This land extraction is of $175.18/ FAR foot supports the appraiser's conclusion of $167.50/FAR foot.

The market value estimate is calculated below.

| Entitled FAR Area | x | Price/FAR Foot | = | Total Land Value |
|---|---|---|---|---|
| 370,340 | x | $167.50 | = | $62,030,000 (Rd.) |

This reflects a land value of $1,356.71/SF based on a land area of 45,721± SF.

### Demolition Costs

The subject is improved with a 91,200 square foot commercial building.  In the Highest and Best use section, the appraiser determined that the subject site is underutilized based on the existing FAR for the site, coupled with recently approved entitlements for a 370,340 square foot mixed-use building.

As previously mentioned, the subject is improved with a 91,200 square foot, two-story, commercial building.  A review of Marshall & Swift Valuation Service Costs have been estimated to be $5.52 to $10.20 per square foot and includes demolition of the improvements, as well as loading and hauling of debris.  Additionally, this cost considers pavement removal and grading.  Due to the size of the subject existing improvements, the appraiser has concluded to a

## SALES COMPARISON APPROACH

### *Demolition Costs (Continued)*

demolition cost similar to the comparables or $10.00 per square foot. This cost estimate should cover the demolition and removal of debris. In addition, the appraiser included an entrepreneurial profit. A typical developer's profit for a project such as the subject ranges between 15% and 25% of costs incurred in today's market. The appraiser has estimated a profit of 25.0% of demolition costs. This results in a demolition cost of $12.50/SF inclusive of profit. As previously stated, since the tenants will vacate in approximately three months, trending is not required. This results in a cost to demolish the improvements of $1,140,000. The total demolition cost is calculated below:

| CALCULATION OF DEMOLITION COSTS | |
|---|---|
| Building Area (SF) | 91,200 |
| Demolition Costs/SF per MVS-66/11 | $    10.00 |
| Demolition Cost Estimate | $912,000 |
| Entrepreneurial Profit @25% | $228,000 |
| Total Demolition Cost | $1,140,000 |
| **Demolition Costs Rd.** | **$1,140,000** |

### *Vacant Lot*

Deducting the demolition costs from the Land Value results in a Vacant Lot Value. The calculation is shown below:

| | |
|---|---|
| Land Value: | $62,030,000 |
| Less: Demolition Cost: | ($1,140,000) |
| Vacant Land Value: | $60,900,000 |

*Numbers may be off due to rounding*

The estimated vacant lot value after deducting the demolition cost is $60,900,000.

As mentioned in the History of the Subject, the owners received a signed letter of intent to purchase the subject for $60,000,000, which is slightly below the appraised value of the subject.

### *"As Is" Fee Simple Market Value*
### *via Sales Comparison Approach* .......................................................................... *$60,900,000 Rd.*

# FINAL VALUE CONCLUSION

The purpose of this appraisal has been to estimate the "As Is" market value of the fee simple interest of the subject property as of January 17, 2023.

The highest and best use analysis suggests that the subject should be demolished in lieu of the proposed mixed-use development.  As such, both the income and cost approaches were not used in this analysis.  The Sales Comparison Approach to value was utilized in this appraisal report and produced the following value estimate.

|  | "As Is" |
| --- | --- |
| **Sales Comparison Approach** | **$60,900,000** |

Reconciliation is the process of analyzing the relevance of the indicated values, resulting in a final value estimate.  In each of these approaches, the appraiser has documented all of the input data and briefly explained the methodology in processing and/or analyzing the data.  In so far as the appraiser is able to determine, the data furnished is from reliable sources and has been accepted as being accurate.  Because the appraisal of real estate is not, by any means, an exact science, some subjective judgment on the part of the appraiser becomes a part of each recognized approach.

The Sales Comparison Approach is based upon the analysis of other recent comparable property sales within the marketplace.  This approach presents sales of other land properties considered to be of similar investment quality.  These sales provide an independent estimate of market value on a per unit comparison level.  This approach is predicated on sufficient market activity among similar properties to make comparisons to the subject property.

Accordingly, the appraiser estimates the "As Is" market value of the fee simple interest in the subject as of January 17, 2023, is:  *$60,900,000.*

| **SIXTY MILLION NINE HUNDRED THOUSAND DOLLARS** |
| --- |

**Insurable Value:**                    **$9,560,000**

*ADDENDA*

# *EXHIBIT A*

### *Excerpts from Title Report/ParcelQuest Profile*

ALTA LOAN POLICY (6/17/06)

## SCHEDULE A

**Name and Address of**
**Title Insurance Company:**

**File No.:** 01180-111683

Stewart Title Guaranty Company
P.O. Box 2029, Houston, TX 77252

**Policy No.:** M-9302-004119091

**Address Reference:** 459 Colyton Street, Los Angeles, CA
(For Company Reference Purposes Only)

**Amount of Insurance:** $4,000,000.00

**Premium:** $3,000.00

**Date of Policy:** August 18, 2014 at 8:00 am

1. **Name of Insured:**

   East West Bank

2. **The estate or interest in the Land that is encumbered by the Insured Mortgage is:**

   Fee Simple

3. **Title is vested in:**

   Capital KCS, LLC, a California limited liability company

4. **The insured Mortgage and its assignments, if any, are described as follows:**

   Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:
   | | |
   |---|---|
   | Amount | : $4,000,000.00 |
   | Dated | : August 11, 2014 |
   | Trustor | : Capital KCS, LLC, a California limited liability company |
   | Trustee | : East West Investment Inc, a California Corporation |
   | Beneficiary | : East West Bank |
   | Recorded | : August 18, 2014, as Instrument No. 20140861710, of Official Records |
   | Loan No. | : 325040026 |

5. **The land referred to in this policy is described as follows:**

   The land referred to herein is situated in the State of California, County of Los Angeles, and described as follows:

   Lots 19 through 24 inclusive in Block "C" of F.P. Howard and Co's Subdivision of the Bliss Tract, in the City of Los Angeles, County of Los Angeles, State of California, as per map recorded in Book 12, Page 42 of Miscellaneous Records, in the Office of the County Recorder of said County.

   APN: 5163-025-009

   (End of Legal Description)

**Copyright 2006-2009 American Land Title Association. All rights reserved.**
The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use.
All other uses are prohibited.  Reprinted under license from the American Land Title Association.
File No. 01180-111683  Policy No. M-9302-004119091
STG ALTA Loan Policy Sch A

Page 1 of 1    **STEWART TITLE**
**GUARANTY COMPANY**



ALTA LOAN POLICY (6/17/06)

# SCHEDULE B
# PART I

**File No.: 01180-111683**

**Policy No.: M-9302-004119091**

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) that arise by reason of:

**Taxes:**

    A.  Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes, to be levied for the fiscal year 2014 – 2015.

    B.  Assessments, if any, for Community Facility Districts affecting said land which may exist by virtue of assessment maps or notices filed by said districts.  Said assessments are collected with the County Taxes.

    C.  The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the revenue and taxation code of the State of California.

**Exceptions:**

    1.  Water rights, claims or title to water in or under said land, whether or not shown by the public records.

    2.  An Oil and Gas Lease for the term therein provided with certain covenants, conditions and provisions, together with easements, if any, as set forth therein, Karl Weber and Mary W. Weber, as lessor and Standard Oil Company of California, a corporation, as lessee, recorded August 15, 1966, in Book M-2316, Page 519, Official Records.

        Said lease affects that portion of said land lying below a depth of 500 feet from the surface thereof.

        Said document was modified by an instrument recorded June 28, 1976, as Instrument No. 5338, Official Records.

        Said document was modified by an instrument recorded August 20, 1986, as Instrument No. 86-1084927, Official Records.

        Said document was re-recorded June 26, 1987, as Instrument No. 87-1023081, Official Records.

    3.  A covenant and agreement
        Recorded:      December 7, 1990, as Instrument No. 90-2030261, Official Records

    4.  A covenant and agreement wherein the owners of said land covenant and agree that said land shall be held as one parcel and no portion shall be sold separately, which covenant is expressed to run with the land and be binding upon future owners.

        Recorded:      December 7, 1990, as Instrument No. 90-2031862, Official Records

    5.  The matters contained in an instrument entitled "Party Wall and Easement Agreement" dated July 1, 2006, by and between Seaton Street Investments, LLC, a California limited liability company and First & Center, LLC, a California limited liability company and Orangethorpe Commerce Center, LLC, a California limited liability company upon the terms therein provided recorded August 8, 2006, as Instrument No. 06-1756836, Official Records.

    6.  Deed of Trust to secure an indebtedness in the amount shown below, and any other obligations secured thereby:

**Copyright 2006-2009 American Land Title Association. All rights reserved.**
The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use.
All other uses are prohibited.  Reprinted under license from the American Land Title Association.
File No. 01180-111683  Policy No.: M-9302-004119091
CA STG ALTA Loan Policy Sch B I EXT SCE



Page 1 of 2   **STEWART TITLE
GUARANTY COMPANY**

ALTA LOAN POLICY (6/17/06)

## SCHEDULE B
## PART I

Amount :          $4,600,000.00
Dated    :        August 5, 2011
Trustor :         Capital KCS, LLC, a California limited liability company
Trustee :         Metro United Bank
Beneficiary:      Metro United Bank
Recorded:         August 22, 2011, as Instrument/File No. 20111127688 of Official Records.
Loan No.:         0870366786

7.  An assignment of rents as additional security for the payment of the indebtedness secured by said deed of trust which assignment was

Executed by:      Capital KCS, LLC, a California limited liability company
To       :        Metro United Bank
Recorded:         August 22, 2011
Instrument/File No.:    20111127689, of Official Records

8.  The matters contained in an instrument

Entitled  Hazardous Substances Certificate and Indemnity Agreement
Dated    :        August 5, 2011
By and between: Capital KCS, LLC, a California limited liability company and Metro United Bank upon the terms and conditions and covenants therein provided
Recorded :        August 22, 2011
As Instrument/File No.:    20111127690 of Official Records.

Copyright 2006-2009 American Land Title Association. All rights reserved.
The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use.
All other uses are prohibited.  Reprinted under license from the American Land Title Association.
File No. 01180-111683  Policy No.: M-9302-004119091
CA STG ALTA Loan Policy Sch B I EXT SCE



ALTA LOAN POLICY (6/17/06)

## SCHEDULE B
## PART II

**File No.: 01180-111683**                                    **Policy No.: M-9302-004119091**

In addition to the matters set forth in Part I of this Schedule, the Title is subject to the following matters, and the Company insures against loss or damage sustained in the event that they are not subordinate to the lien of the Insured Mortgage:

1. An assignment of rents and leases, executed by Capital KCS, LLC, a California limited liability company, to East West Bank, recorded August 18, 2014, as Instrument No. 20140861711, of Official Records.

End of Exceptions

**Copyright 2006-2009 American Land Title Association. All rights reserved.**
The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use.
All other uses are prohibited.  Reprinted under license from the American Land Title Association.
File No. 01180-111683  Policy No.  M-9302-004119091
STG ALTA Loan Policy Sch B II

Page 1 of 1      **STEWART TITLE**
**GUARANTY COMPANY**

AMERICAN
LAND TITLE
ASSOCIATION



**County Last Updated: 01/13/2023**

## Property Location

| | | | | | |
|---|---|---|---|---|---|
| **Address:** | 459 COLYTON ST | **City:** | LOS ANGELES | **Zip:** | 90013- |
| **APN#:** | 5163-025-009 | **Use Code:** | Light Industrial | **County:** | Los Angeles |
| **Tract:** | F P HOWARD & COS SUB OF THE BL | **Census Tract:** | 2060.31 | **Zone:** | LAM3 |
| **Map Page/Grid:** | 634/ G5 | **Legal Desc:** | F P HOWARD AND CO'S SUB LOTS 19,20 21,22,23 AND LOT 24 BLK C | | |
| **Total Assessed Value:** | 8,009,030 | **Tax Amount:** | 112,238.61 | | |
| **Percent Improvement:** | 0.09 | **Tax Year / Assessor Year:** | 2022 / 2022 | | |

## Current Owner Information

| | | | |
|---|---|---|---|
| **Current Owner:** | CAPITAL KCS LLC | **Owner Address:** | PO BOX 80084 |
| **City, State, Zip:** | SAN MARINO, CA, 91118-8084 | **Owner Occupied:** | No |
| **Last Transaction:** | 04/04/2019 | **Deed Type:** | deed of trust |
| **Amount:** | 15,500,000 | **Document:** | 0000294994 |

## Last Sale Information

| | | | |
|---|---|---|---|
| **Transferred From:** | FIRST & CENTER LLC | **Seller Address:** | |
| **Recording / Sale Date:** | 07/01/2008 / 03/24/2008 | **Prior Recording / Sale Date:** | / |
| **Most Recent Sale Price:** | 6,600,000 | **Prior Sale Price:** | |
| **Document Number:** | 0000168201 | **Prior Document No.:** | |
| **Document Type:** | grant deed/deed of trust | **Prior Document Type:** | |

## Lender Information

| | | | |
|---|---|---|---|
| **Lender:** | BANK OF AMERICA | **Full/Partial:** | F |
| **Loan Amount / 2nd Trust Deed:** | 2,750,000 / 1,925,000 | **Loan Type:** | conventional fix |

## Physical Information

| | | | | | |
|---|---|---|---|---|---|
| **Building Area:** | 91,200 | **# of Bedrooms:** | 0 | **Lot Size Sqft / Acreage:** | 45,730 / 1.05 |
| **Additional:** | 0 | **# of Bathrooms:** | 0.00 | **Year Built / Effective:** | 0 / 0 |
| **Garage:** | 0 | **# of Stories:** | 2 | **Heating:** | |
| **First Floor:** | 0 | **Total Rooms:** | 0 | **Cooling:** | |
| **Second Floor:** | 0 | **# of Units:** | 0 | **Roof Type:** | |
| **Third Floor:** | 0 | **Garage/Carport:** | | **Construction/Quality:** | / 0 |
| **Basement Finished:** | 0 | **Fireplaces:** | 0 | **Building Shape:** | |
| **Basement Unfinished:** | 0 | **Pool/Spa:** | | **View:** | |

## Flood Data and Map

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Flood Zone:** | X | **Panel Number:** | 06037C1636G | **Panel Date:** | 2018-12-21 | **Community Number:** | 060137 |

©2023 Copyright All Rights Reserved. **ParcelQuest** www.parcelquestappraise.com



County Last Updated: 01/13/2023

**Deed History**

| Sale | Transaction | Date | Document | Amount | Loan | From | To | Type |
|---|---|---|---|---|---|---|---|---|
| | refi | 04/04/2019 | 0000294994 | 15,500,000 | 15,500,000 | | CAPITAL KCS LLC | deed of trust |
| | REFI | 04/04/2019 | | 0 | 15,500,000 | | CAPITAL KCS LLC | grant deed / deed of trust |
| | refi | 11/27/2018 | 0001187880 | 5,500,000 | 5,500,000 | | CAPITAL KCS LLC | deed of trust |
| | refi | 02/14/2017 | 0000181538 | 5,000,000 | 5,000,000 | | CAPITAL KCS LLC | deed of trust |
| | refi | 08/22/2011 | 0001127688 | 4,600,000 | 4,600,000 | | CAPITAL KCS LLC | deed of trust |
| | refi | 07/25/2008 | 0001332796 | 1,925,000 | 1,925,000 | | CAPITAL KCS LLC | deed of trust |
| * | RESALE | 07/01/2008 | 0000168201 | 6,600,000 | 2,750,000 | FIRST & CENTER LLC | CAPITAL KCS LLC | grant deed / deed of trust |
| * | RESALE | 06/28/2005 | 0001516413 | 0 | 3,240,000 | 440 SEATON INC | ORANGETHORPE COMMERCE CTR LLC | grant deed / deed of trust |

# *EXHIBIT B*

### *Excerpts of Determination Letter*



# LOS ANGELES CITY PLANNING COMMISSION

200 North Spring Street, Room 272, Los Angeles, California, 90012-4801, (213) 978-1300
www.planning.lacity.org

## LETTER OF DETERMINATION

DATE: **DEC 26 2019**

**Case No. CPC-2016-4475-GPA-VZC-HD-MCUP-CUX-DB-SPR**    Council District: 14 – Huizar
CEQA: ENV-2016-4476-EIR (SCH No. 2017041012)
Plan Area: Central City North
Related Case: VTT-74703

**Project Site:**  1101 East 5th Street; 1129 East 5th Street; 445-457 South Colyton Street; 450-456
South Seaton Street

**Applicant:**  Kevin Chen, Arts District Development, LLC
Representative: Anne Williams, Psomas

At its meeting of **December 12, 2019**, the Los Angeles City Planning Commission took the actions
below in conjunction with the approval of the following project:

Demolition and removal of all existing uses on the Project Site, and development of a new mixed-
use building, including 129 live/work condominium units, a 113-room hotel, and 81,326 square
feet of commercial space to be used for art galleries, retail, restaurant, and artist collaborative
space. Of the 129 live/work units, 15 units (or, 11 percent) would be set aside for Very Low Income
households. The proposed building would be 12 stories (164 feet) in height. The Project includes
304 automobile parking spaces provided in two of three subterranean levels.

1. **Found**, based on the independent judgment of the decision-maker, after consideration of the
   whole of the administrative record, the project was assessed in the previously certified
   Environmental Impact Report No. ENV-2016-4476-EIR (SCH No. 2017041012), which
   includes the Draft EIR dated February 2019, and the Final EIR, dated September 2019,
   certified on October 11, 2019; and pursuant to CEQA Guidelines, Sections 15162 and 15164,
   no subsequent EIR, negative declaration, or addendum is required for approval of the project;
2. **Approved** and **Recommended** that the Mayor and City Council **adopt**, pursuant to Charter
   Section 555 and Section 11.5.6 of the Los Angeles Municipal Code (LAMC), a General Plan
   Amendment to the Central City North Community Plan to change the Central City North
   Community Plan land use designation of the Project Site from Heavy Industrial to Regional
   Center Commercial;
3. **Approved** and **Recommended** that the City Council **adopt,** pursuant to LAMC Section 12.32
   Q, a Vesting Zone Change and Height District Change from M3-1-RIO to (T)(Q)C2-2-RIO;
4. **Approved,** pursuant to LAMC Section 12.24 W.1, a Master Conditional Use to permit the sale
   and dispensing of a full line of alcoholic beverages for off-site consumption at up to two
   establishments, and on-site consumption at up to 13 establishments;
5. **Approved,** pursuant to LAMC Section12.24 W.18, a Conditional Use Permit for live
   entertainment and dancing;

6. **Approved,** pursuant to LAMC Section 12.22 A.25(g)(2), the following two Affordable Housing On-Menu Incentives:

      a.  A 35-percent increase in Floor Area Ratio; and

      b.  12-foot side yard setback in lieu of the 14 feet otherwise required;

7. **Approved,** pursuant to LAMC Section 16.05 a Site Plan Review for a project resulting in an increase in 50 or more dwelling units;

8. **Adopted** the modified Conditions of Approval; and

9. **Adopted** the attached Findings**.**

The vote proceeded as follows:

| | |
|---|---|
| Moved: | Ambroz |
| Second: | Choe |
| Ayes: | Leung, Mack, Millman, Mitchell, Padilla-Campos, Perlman, Khorsand |

**Vote:**      **9-0**

Irene Gonzalez, Commission Office Manager
Los Angeles City Planning Commission

Fiscal Impact Statement: There is no General Fund impact as administrative costs are recovered through fees.

**Effective Date/Appeals:** The decision of the Los Angeles City Planning Commission as it relates to the General Plan Amendment is final. The Zone Change and Height District Change is appealable by the Applicant only, if disapproved in whole or in part by the Commission. The decision of the Los Angeles City Planning Commission, regarding the remaining approvals, is appealable to the Los Angeles City Council within 20 days after the mailing date of this determination letter. Any appeal not filed within the 20-day period shall not be considered by the Council. All appeals shall be filed on forms provided at the Planning Department's Development Service Centers located at: 201 North Figueroa Street, Fourth Floor, Los Angeles; 6262 Van Nuys Boulevard, Suite 251, Van Nuys; or 1828 Sawtelle Boulevard, West Los Angeles.

**FINAL APPEAL DATE:** ___JAN 15 2020___

Notice: An appeal of the CEQA clearance for the Project pursuant to Public Resources Code Section 21151(c) is only available if the Determination of the non-elected decision-making body (e.g., ZA, AA, APC, CPC) **is not further appealable** and the decision is final.

If you seek judicial review of any decision of the City pursuant to California Code of Civil Procedure Section 1094.5, the petition for writ of mandate pursuant to that section must be filed no later than the 90th day following the date on which the City's decision became final pursuant to California Code of Civil Procedure Section 1094.6. There may be other time limits which also affect your ability to seek judicial review.

Attachments: Zone Change Ordinance, Maps, Modified Conditions of Approval, Findings, Resolution

      c: Debbie Lawrence, Senior City Planner
        William Lamborn, City Planner

## (Q) QUALIFIED CONDITIONS

### (As modified by the City Planning Commission on December 12, 2019)

Pursuant to Section 12.32 G of the Municipal Code, the following limitations are hereby imposed upon the use of the subject property, subject to the "Q" Qualified classification.

1. **Site Development.** The use and development of the property shall be in substantial conformance with the plans submitted with the application and marked Exhibit A, dated November 4, 2019. No change to the plans, including modifications to the building's exterior architectural design features including the brickwork, façade artwork, and multi-colored glass, will be made without prior review by the Department of City Planning, and written approval by the Director of Planning. Each change shall be identified and justified in writing. Minor deviations may be allowed in order to comply with the provisions of the Municipal Code or the project conditions.

2. **Use.** The use and area regulations of the development shall be developed for uses as permitted in the C2 Zone as defined in LAMC Section 12.14, except as modified by the conditions herein  or subsequent action.

3. **Residential Density.** The project shall be limited to a maximum density of 129 residential live/work units, of which 15 units, or 11% of the total units provided, shall be set aside/restricted to Very Low Income households.

4. **Guest Rooms.** The project shall be limited to a maximum number of 113 hotel guest rooms.

5. **Commercial Floor Area.** The project shall be limited to a maximum commercial floor area of 81,326 square feet, as follows:

   a. Retail: 27,888 square feet
   b. Restaurant: 32,283 square feet
   c. Art Gallery: 17,755 square feet
   d. Artist Production (Artist Collaborative): 3,400 square feet

6. **Floor Area Ratio.** The Floor Area Ratio (FAR) of the Project shall be limited to a maximum FAR of 8.1:1, or 370,340 square feet of floor area.

CPC-2016-4475-GPA-VZC-HD-MCUP-CUX-DB-SPR                                    C-1

**CONDITIONS OF APPROVAL**

(As modified by the City Planning Commission on December 12, 2019)

Pursuant to LAMC Sections 12.32, 12.24 W.1, 12.24 W.18, 12.22 A.25(g)(2), and 16.05, the following conditions are hereby imposed upon the use of the subject property.

**Development Conditions**

1. **Site Development.** The use and development of the property shall be in substantial conformance with the plot plan submitted with the application and marked Exhibit A stamp-dated November 4, 2019, except as may be revised as a result of this action.  No change to the plans, including modifications to the building's exterior architectural design features including the brickwork, façade artwork, and multi-colored glass, will be made without prior review by the Department of City Planning, and written approval by the Director of Planning, with each change being identified and justified in writing. Minor deviations may be allowed in order to comply with provisions of the Municipal Code, the subject conditions, and the intent of the subject permit authorization.

2. **Development Services Center.**  Prior to sign-off on building permits by the Department of City Planning's Development Services Center for the project, the Department of City Planning's Major Projects Section shall confirm, via signature, that the project's building plans substantially conform to the conceptual plans stamped as Exhibit "A", as approved by the City Planning Commission.

   Note to Development Services Center:  The plans presented to, and approved by, the City Planning Commission (CPC) included specific architectural details that were significant to the approval of the project. Plans submitted at plan check for condition clearance shall include a signature and date from Major Projects Section planning staff to ensure plans are consistent with those presented at CPC.

3. **Uses.** The project shall be limited to a maximum of 129 live/work residential units and 81,326 square feet of commercial uses, as follows:

   a. Retail: 27,888 square feet
   b. Restaurant: 32,283 square feet
   c. Art Gallery: 17,755 square feet
   d. Artist Production (Artist Collaborative): 3,400 square feet

4. **Height.** The building shall not exceed a maximum height of 164 feet, excluding roof structures and equipment, as defined by LAMC Section 12.21.1.

5. **Floor Area Ratio.** The Floor Area Ratio (FAR) of the Project shall be limited to a maximum FAR of 8.1:1, or 370,340 square feet of total floor area.

6. **Affordable units.** A minimum of 15 units, or 11 percent of the total dwelling units, shall be reserved as affordable units, as defined by the State Density Bonus Law 65915(c)(1) or (c)(2). Affordable units required as replacement units, per Government Code 65915, shall be an equivalent size or type, or both, as those units being replaced.

7. **Changes in Restricted Units.** Deviations that decrease the number of restricted affordable units or that change the composition of units shall be consistent with LAMC Section 12.22 A.25 (9a-d).

8. **Housing Requirements.** Prior to issuance of a building permit, the owner shall execute a

    **a. The incentives do not result in identifiable and actual cost reductions to provide for affordable housing costs as defined in California Health and Safety Code Section 50052.5 or Section 50053 for rents for the affordable units.**

### On-Menu Incentives

The record does not contain substantial evidence that would allow the Commission to make a finding that the requested on-menu incentives do not result in identifiable and actual cost reductions to provide for affordable housing costs per State Law. The California Health & Safety Code Sections 50052.5 and 50053 define formulas for calculating affordable housing costs for very low, low, and moderate income households. Section 50052.5 addresses owner-occupied housing and Section 50053 addresses rental households. Affordable housing costs are a calculation of residential rent or ownership pricing not to exceed 25 percent gross income based on area median income thresholds dependent on affordability levels.

The list of on-menu incentives in 12.22 A.25 were pre-evaluated at the time the Density Bonus Ordinance was adopted to include types of relief that minimize restrictions on the size of the project. As such, the Department will arrive at the conclusion that the density bonus on-menu incentives will result in identifiable and actual cost reductions that provide for affordable housing costs because the incentives by their nature increase the scale of the project.

The requested incentives for a 35-percent increase in Floor Area Ratio and a 12-foot side yard setback in lieu of the 14 feet otherwise required, are expressed in the Menu of Incentives per LAMC 12.22 A.25(f) and, as such, permit exceptions to zoning requirements that result in building design or construction efficiencies that provide for affordable housing costs. The requested incentives allow the developer to expand the building envelope so the additional units can be constructed and the overall space dedicated to residential uses is increased. These incentives support the Applicant's decision to set aside 15 Very Low Income dwelling units for 55 years.

*Floor Area Ratio Increase:*

The Project Site is zoned M3-1-RIO and has a General Plan land use designation of Heavy Industrial. The M3-1-RIO Zone allows light manufacturing and commercial uses but does not permit residential development. The property is currently subject to Height District No. 1, which restrict the maximum FAR on the Site to 1.5:1.

In combination with the proposed C2 Zone, the proposed Height District No. 2 sets forth a maximum base FAR of 6:1. The Project is requesting an On Menu Density Bonus Incentive for a 35% increase in FAR, resulting in a maximum FAR of 8.1:1. As proposed, the building's maximum floor area of ==370,340 square feet and 8.1:1 FAR== would be consistent with the maximum base 6:1 FAR, with a 35% increase in FAR, pursuant to the requested Density Bonus Incentive.

The requested incentive allows the developer to expand the building envelope so the additional units can be constructed and the overall space dedicated to residential uses is increased. These incentives support the Applicant's decision to set aside 15 Very Low Income dwelling units for 55 years.

*Yard/setback reduction:*

The City of Los Angeles, as lead agency, acting through the Department of City Planning, prepared an environmental impact report (EIR), consisting of a Draft EIR and Final EIR, under case number ENV-2016-4476-EIR. Pursuant to the California Environmental Quality Act (California Public Resources Code Sections 21000-21189.57)(CEQA), the EIR is intended to serve as an informational document for public agency decision-makers and the general public regarding the objectives and components of the Arts District Center Project, consisting of a mixed-use project comprised of 129 live / work condominium units, a 113-room hotel, and 81,326 square feet of commercial space, located at 1101 East 5th Street, 1129 East 5th Street, 445-457 South Colyton Street, and 450-456 South Seaton Street, in the Central City North Community Plan area of Los Angeles (Site or Project Site). In a determination letter dated October 11, 2019, the City's Deputy Advisory Agency (DAA) certified the EIR; adopted the environmental findings prepared for the Project as well as a statement of overriding considerations and a mitigation monitoring program (MMP); and approved the Project's vesting tentative tract map (VTTM). A Notice of Determination was filed on October 16, 2019 with the Los Angeles County Clerk. No appeal was filed with respect to the DAA's approval of the VTTM. The appeal period closed on October 21, 2019.

CEQA and the State CEQA Guidelines (California Code of Regulations, Title 14, Chapter 3, Sections 15000-15387) allow the City to rely on the previously certified EIR unless a Subsequent or Supplemental EIR is required. Specifically, CEQA Guidelines Sections 15162 and 15163 require preparation of a Subsequent or Supplemental EIR when an EIR has been previously certified or a negative declaration has previously been adopted and one or more of the following circumstances exist:

1.  Substantial changes are proposed in the project which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects;

2.  Substantial changes occur with respect to the circumstances under which the project is undertaken which will require major revisions of the previous EIR or negative declaration due to the involvement of new significant environmental effects or a substantial increase in the severity of previously identified significant effects; or

3.  New information of substantial importance, which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete or the negative declaration was adopted, shows any of the following:

    •   The project will have one or more significant effects not discussed in the previous EIR or negative declaration;

    •   Significant effects previously examined will be substantially more severe than shown in the previous EIR;

    •   Mitigation measures or alternatives previously found not to be feasible would in fact be feasible, and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or

    •   Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant

CPC-2016-4475-GPA-VZC-HD-MCUP-CUX-DB-SPR                                        Council District No. 14

## RESOLUTION

**WHEREAS**, the subject project is located within the area covered by the Central City North Community Plan ("Community Plan"), adopted by the City Council on December 15, 2000; and

**WHEREAS**, the City Planning Commission, at its meeting on December 12, 2019, recommended <u>approval</u> of an amendment to re-designate the Project Site located at **1101 East 5th Street, 1129 East 5th Street, 445-457 South Colyton Street, and 450-456 South Seaton Street,** from Heavy Industrial to Regional Commercial; and recommended <u>approval</u> of a Vesting Zone and Height District Change from M3-1-RIO to (T)(Q)C2-2-RIO; and

**WHEREAS**, the <u>approved</u> Project proposes the demolition and removal of all existing uses on the Project Site, and development of a new mixed-use building, including 129 live/work condominium units, a 113-room hotel, and 81,326 square feet of commercial space to be used for art galleries, retail, restaurant, and artist collaborative space. Of the 129 live/work units, 15 units (or, 11 percent) would be set aside for Very Low Income households. The proposed building would be 12 stories (164 feet) in height. The Project includes 304 automobile parking spaces provided in two of three subterranean levels; and

**WHEREAS**, pursuant to the provisions of the Los Angeles City Charter, the Mayor and City Planning Commission have transmitted their recommendations; and

**WHEREAS**, the requested General Plan Amendment <u>is consistent</u> with the intent and purpose of the adopted Central City North Community Plan to designate land use in an orderly and unified manner; and

**WHEREAS**, the Regional Commercial land use designation and the (T)(Q)C2-2-RIO Zone will allow the Project as described above, which is <u>consistent</u> with the Plan and Zone; and

**WHEREAS**, the subject proposal has been assessed in the previously certified Environmental Impact Report (EIR) No. ENV-2016-4476-EIR (SCH No. 2017041012), which includes the Draft EIR dated February 2019, and the Final EIR, dated September 2019, certified on October 11, 2019; and pursuant to CEQA Guidelines, Sections 15162 and 15164, no subsequent EIR, negative declaration, or addendum is required for approval of the project.

**NOW, THEREFORE, BE IT RESOLVED** that the Central City North Community Plan be amended as shown on the attached General Plan Amendment Map.

# *EXHIBIT C*

### *Required Bank Forms*

## EASTWEST BANK – APPRAISAL DIVISION
## ENVIRONMENTAL CHECKLIST

Property Address: _____459 Colyton St., Los Angeles, CA_____   Appraiser Name (Please Initial): __JO__

Property Type: __Commercial building with office over retail__   Date Completed: __January 17, 2023__

| | | Yes | No |
|---|---|---|---|
| 1. | SUBJECT SITE HISTORY: Based on your investigation and site inspection, does it appear that the subject had Previously been improved or utilized for agriculture, commercial or industrial use? | | X |
| 2. | Have you learned of any current or past environmental problems involving the site and/or improvements? | | X |
| 3. | From your inspection and research, have you observed or come to know of any properties located in close proximity to the subject that are known to have environmental hazards? | | X |
| 4. | ASBESTOS CONTAINING MATERIAL (ACM): Based on your investigation, do any of the improvements appear to contain any asbestos containing material? | | X |
| 5. | UNDERGROUND STORAGE TANKS, CHEMICAL DRUMS AND PIPELINES: Were any observations made or information provided that would indicate the site contains underground storage tanks or extensive/unusual pipeline systems?   In addition, were any drums observed on the property? | | X |
| 6. | PCB CONTAINING EQUIPMENT: Did you observe any electrical transformers or electrical generation equipment? | | X |
| 7. | EMISSIONS: Were any unusual air emissions or odors noted on the property? | | X |
| 8. | WASTEWATER OR WATER CONTAMINATION: Were any unusual stains or signs of seepage observed on the property? | | X |
| 9. | WASTE GENERATION, STORAGE AND DISPOSAL: Based on your investigation and site inspection, does it appear that the subject had previously been utilized for waste generation, storage or disposal? | | X |
| 10. | AGRICULTURAL CHEMICALS: Have any pesticides herbicides or other agricultural chemicals been noted on the site? In addition, were any areas of unusual stressed vegetation observed? | | X |

*The above responses are based on visual observations and normal appraisal due diligence. The appraiser is not qualified to confirm or deny the existence of hazardous materials or conditions. Determination of problems requires the investigation and study by individuals trained in the fields of environmental assessment. Please comment on Yes responses and provide pictures as necessary.*

Comments: The subject site is improved with a two-story commercial building with ground floor retail and office above. We found no evidence of hazardous materials or hazardous conditions affecting the subject property.

# INSURABLE REPLACEMENT COST ESTIMATE

**PROPERTY:**                              >              Commercial Building

**LOCATION:**                            >              459 Colyton Street
                                                                        Los Angeles, CA

**PROPERTY DESCRIPTION:**       >              Ground floor retail with second
                                                                         floor live/work

## INSURABLE REPLACEMENT COST CALCULATIONS:

| | | | | | |
|---|---|---|---|---|---|
| Building #: | 459 Colyton St | | | | |
| Building Size (SF): | 91,200 | | | | |
| Structure Class: | C (Average) | | | | |
| Marshall Valuation Service Reference: (or source referenced) | Sec 14; Pg 35 (02/22) | | | | |
| Base Cost PSF: | $47.00 | | | | |
| Plus (PSF) | | | | | |
| Tenant Improvements | $40.00 | | | | |
| Fire Sprinklers | $2.75 | | | | |
| > | | | | | |
| > | | | | | |
| Subtotal: | **$89.75** | | | | |
| Multipliers  Multipliers | | | | | |
| Number of Stories: | 1.00 | | | | |
| Height Per Story: | 1.00 | | | | |
| Perimeter: | 0.97 | | | | |
| Calculator Cost: | 1.14 | | | | |
| Local: | 1.18 | | | | |
| Adjusted Cost PSF: | $116.51 | | | | |
| Less 10% Non Perishable: | $11.65 | | | | |
| Adjusted Cost PSF: | $104.86 | | | | |
| Estimated Insurable Replacement Cost: | **$9,560,000** | | | | |

*EXHIBIT D*

*Engagement Letter*

EAST WEST BANK

## Engagement Letter - Commercial Appraisal (In summary or narrative format)

| | |
|---|---|
| Date: | 11/25/2022 |
| Appraisal Firm: | ACORE CONSULTANTS |
| Appraiser: | JOHN OLIVAS President |
| Appraiser Phone/Fax: | Tel#: (818) 519-4080 Fax#: |
| Appraiser Address: | 20555 DEVONSHIRE STREET, CHATSWORTH, California,  91311 |
| File#: | 20690 |
| Borrower: | Capital KCS LLC |
| Property Type: | Mixed Use Commercial, Mixed Use - Retail & Apartments |
| Subject Property: | 459 Colyton Street, Los Angeles, California 90013 Los Angeles |

Dear JOHN OLIVAS,

This letter confirms that East West Bank has engaged your services to provide us with a Commercial Appraisal (In summary or narrative format) Report of the referenced property as indicated in the addendum to this letter. Your engagement is as an independent contractor and not as an employee or agent of East West Bank.

By accepting this Commercial Appraisal (In summary or narrative format) assignment, you and any staff member associated with this assignment certify that you have no direct or indirect interest, financial or otherwise, in the property or transaction, or relationship with the ownership or borrower. Moreover, you agree not to accept or pursue the appraisal, or related assignments, of the subject property for a minimum of one year from the delivery date (12/15/2022) of the final Commercial Appraisal (In summary or narrative format) report without written consent from East West Bank.

A qualified, appropriately licensed/certified staff appraiser may perform the appraisal and a qualified appropriately registered appraisal assistant may assist in the preparation of the appraisal. This Commercial Appraisal (In summary or narrative format) assignment may not be subcontracted to an outside individual or firm without East West Bank's Appraisal Department's prior written consent.

The report must comply with the requirements of the Federal Reserve Board, the Uniform Standards of Professional Appraisal Practice (USPAP) as provided by the Appraisal Foundation and the federal bank regulating agencies, Title XI of the Federal Financial Institution Reform, Recovery and Enforcement Act (FIRREA) and East West Bank's Appraisal Policies and Procedures. The appraiser must not rely on conclusions that are based on characteristics related to race, color, religion, national origin, gender, marital status, familial status, age, receipt of public assistance income, handicap, or group homogeneity.

Additional assignment conditions, if any, will be described in the addendum to this engagement letter.

### Appraisal Fee
The appraisal fee shall not exceed **$XXX**. No adjustment to the fee shall be made without prior written consent from a representative of the East West Bank's Appraisal Department. It is the Bank's understanding that the fee for this assignment includes all expenses for any assistance you feel necessary or appropriate. Original, signed Commercial Appraisal (In summary or narrative format) report, in electronic format, should be delivered as instructed in the addendum of this letter no later than the specified due date. If delays are anticipated or occur, you must immediately request an extension of the due date in writing from the undersigned in order to avoid late fees or penalties.

### Appraisal Due Date
Please upload the completed Commercial Appraisal (In summary or narrative format) report to East West Bank's YouConnect system on or before **12/15/2022**. We require an electronic version of the completed appraisal in PDF format to be uploaded to East West Bank's YouConnect system from the Report Submission web form on or before 12/15/2022. Please include the signed Commercial Appraisal (In summary or narrative format) Report as a part of the completed appraisal.

If you have any questions or need additional information please contact Appraisal Department at (626) 312-5949 or by utilizing the "Vendor/Job Manager Discussion" section located on the Report Submission web form with any questions regarding this process. **Please do not utilize external email.** Timing is a critical aspect of this assignment and the stated due date has been a substantial factor in our decision to utilize your firm. The Appraisal Department will provide review comments if there are any questions or concerns with the Commercial Appraisal (In summary or narrative

format) report. Please provide the final revised report within two (2) business days from the receipt of our review comments.

**In keeping with our goal of timely delivery of appraisal reports, EWB has instituted a late fee of 10% of the appraisal fee for the first day late. Delivery must be made by end of business on the agreed date to be considered on time. For each additional day late, a fee of $100 per day will be charged. The reports should be addressed to the Chief Appraiser or as indicated in the engagement letter and uploaded to East West Bank's YouConnect system. The Chief Appraiser will determine if late fees will be assessed.**

<u>Appraisal Requirements</u>
Criteria for this Commercial Appraisal (In summary or narrative format) assignment are established by the Appraisal Department of East West Bank. This Engagement Letter, constitutes the understanding between Company and Appraiser, and supersedes all prior communications, representations, or agreements, whether oral or written, relating to the subject matter of this Engagement Letter.

A copy of the following items must be included in the addenda of each copy of the final Commercial Appraisal (In summary or narrative format) report:

1. Valid Certification/License

2. Qualifications

When applicable, discounted cash flow analysis should be performed using Excel or the most recent version of ARGUS and a copy of the Excel file should be emailed to us, or if Argus was used, a copy of the Argus assumptions and reports should be included in the Commercial Appraisal (In summary or narrative format) report.

<u>Scope of Work Rule:</u>
The **'Scope of Work'** includes, but is not limited to, the following: (1) the degree to which the property is inspected and identified; (2) the extent of research into physical or economic factors that could affect the property; (3) the extent of the data research; and (4) the type and extent of analysis applied to arrive at opinions and conclusion/s.

The **'Scope of Work'** includes collection, verification, and analysis of applicable general and specific data. **General data** includes being familiar with economic trends, local market conditions, demographics, government regulations, social attitudes, purchasing power, price levels, building fluctuations and costs, taxes and financing. **Specific data** about the subject property and the comparables are collected, verified, and analyzed. Unless otherwise stated, both the interior and exterior of the subject property are inspected to ascertain the physical attributes of the improvements.

All applicable approaches to value are developed with a reconciliation to form a conclusion as to the subject's market value. The final step is to report the analyses, opinions, and conclusions in an **Commercial Appraisal (In summary or narrative format) Report**.

<u>Purpose</u>
The purpose of this Commercial Appraisal (In summary or narrative format) report is to estimate the **As Is Market Value** of the subject property, as defined in the Interagency Appraisal and Evaluation Guidelines that became effective on December 10, 2010. The As Is market value is defined as the estimate of the market value of real property in its current physical condition, use, and zoning as of the appraisal's effective date.

<u>Function</u>
The function of this appraisal is for use by East West Bank, for potential loan underwriting or portfolio monitoring purposes. It may be used in connection with the acquisition, disposition, and financing of the sale of the property.

<u>Report Dates</u>
The date of value of the appraisal is the last date of the property inspection. The date of value must be no more than 14 days from the date of inspection. The intent is to provide a current date of value.

<u>Report Copies and Invoices</u>
You will be contacted to discuss any questions that may arise during the review process. Any required corrections or supplementations must be completed in a timely manner; the appraisal fees may be withheld until the completion of the review.

Once finalized, and approved, please provide a completed appraisal report (all with maps, original photographs, and signature) together with your invoice, by uploading the report to East West Bank's YouConnect system.

**All reports and invoices must be submitted in PDF format only.**

All invoices must contain a unique vendor invoice number, the file number, the service address, and the property name, so the invoice can be processed in a timely manner. Any incomplete invoice will be delayed and may not be processed. East West Bank is not responsible for vendor delivery errors.

**Client for Report**

East West Bank
Mr. Ernie Lopez
SVP, Chief Appraiser
228 W. Garvey Ave.
Monterey Park, CA 91754

Email: Ernesto.Lopez@eastwestbank.com

**Additional Requirements and Comments**

1. Do not provide the loan applicant, property owner, or borrower with a draft copy completed appraisal report or information about the concluded appraisal value(s) of the property.

2. It is our understanding that **JOHN OLIVAS**, or an appraiser designated by the approved East West Bank Appraiser, will be inspecting the subject, collecting and confirming the market data, and preparing and signing the Commercial Appraisal (In summary or narrative format) report. The approved East West Bank Appraiser accepts full responsibility for the designated Appraiser by signing the report. Please contact the **Appraisal Department** immediately if this is not the case.

3. You are asked to provide updates using YouConnect regarding the status of the assignment to ensure an on-time delivery of the appraisal.

4. We are looking for sufficient due diligence, data collection, data verification, and analysis in appraisal reports completed for East West Bank. For example, the inspection of the real estate with verification of physical information and condition is important. We expect that a sufficient quantity and quality of market data is uncovered, verified, and analyzed in the appraisal report. For example, in support of the rental projection, we expect a sufficient quantity and quality of rental comparable data are gathered and analyzed. This includes a majority of the data representing actual lease transactions, with pertinent deal points. Supplemental listing data is encouraged; however, actual transactions should represent the majority of the data.

5. **The appraiser is responsible for confirming the building square footage figures utilized in the analysis. Please avoid relying solely on previous appraisal square footage figures, information from the borrower, and data available from public records. Cross-check as necessary by personal measurement, and/or take-offs from the building plans. Source all building measurements used in the appraisal.**

**Supplemental Data Attached**

1. Insurable Value Worksheet
2. Environmental Checklist

**Appraisal Department**
For appraisal-related questions regarding this engagement, please place your comments, questions, and or concerns in the comments section on the Report Submission vendor webform.

Please review the enclosed materials immediately. If additional information is needed, please call Appraisal Department at   or you may make a comment on the Report Submission webform. Any items received from the borrower must be returned to this office along with the information obtained from this office at the completion of the Commercial Appraisal (In summary or narrative format) assignment in order to keep our records complete.

**The enclosed information, together with any additional information gathered from East West Bank, our customer(s), their employees or assigned agents, regarding this assignment, is considered CONFIDENTIAL. This is HIGHLY SENSITIVE information and it is not to be photocopied or shared with anyone. It must be returned to this office at the conclusion of the appraisal assignment. Contact this office IMMEDIATELY if you discover that an "As Is" Market Value cannot be estimated because of lack of information, for example, if there is evidence the property may be impacted by adverse environmental, soils, legal, or other conditions which must be further evaluated.**

Sincerely,
*EWB APPRAISAL DEPARTMENT*

**ADDENDUM TO ENGAGEMENT LETTER**

**Property Contact or Information**
Please arrange an inspection of the property and make your initial request for information with the property contact listed in the addendum to this letter.

**Assignment Contacts:**

| | |
|---|---|
| Loan Officer: | DIANA PUN, (T): |
| Contact Person: | Kevin Chen, (T): (213) 663-7999, (E): |

Your initial request for information should be made through the YouConnect system by submitting a comment on the Report Submission webform within two business days of receipt of this letter. Any questions regarding this assignment should be communicated through YouConnect.

At no time during this Commercial Appraisal (In summary or narrative format) assignment (either prior to or following delivery of the report) are you to engage in discussions with individuals, other than East West Bank's Appraisal staff regarding your value conclusion(s) or the direction of your value conclusion(s) without prior authorization from EWB's Appraisal Department.

Representatives of East West Bank may provide you with information that is necessary to perform the required scope of work. This information should not suggest the property's value or influence your final value conclusions. All information provided by East West Bank should be considered confidential and subject to the requirements of the Confidentiality Section of the Ethics Rule of USPAP.

Borrower: Capital KCS LLC

**Property Data:**

| | |
|---|---|
| File #: | 20690 |
| Property Description: | The subject has obtained entitlements for the new mixed use building including 129 live/work condo units, 113-room hotel, and 81,326 square feet of commercial space as of December 26, 2019 |
| Legal Description: | |
| Property Type: | Mixed Use Commercial, Mixed Use - Retail & Apartments |
| Street Address: | 459 Colyton Street |
| City and State: | Los Angeles, California |
| County: | Los Angeles |
| Zip Code: | 90013 |
| Property Tenancy: | Owner Occupied |
| GBA: | 91,200 (SF) |
| Lot Size: | 45,721 (SF) |
| Parcel #: | 5163-025-009 |
| Construction Type/Property Status: | Existing |

**Appraisal Assignment:**

| | |
|---|---|
| Report Format: | Appraisal Report |
| Appraisal Fee: | $XXX |
| Due Date: | 12/15/2022 |
| Inspection Requirements: | |
| Additional Scope of Work: | The property is believed to be mostly vacated, except for some spaces occupied by related parties not paying rents. So, there isn't any current income statement or rent roll. The property is pending for redevelopment. The previous appraisal appraised the property as land with entitlements. |
| SBA: | No |

**Valuation Scenarios Requested:**

| *Value Premise:* | *Interest appraised:* | *Comments:* |
| --- | --- | --- |
| Market Value - As Is | Fee Simple | entitled land |

The interest(s) appraised should be consistent with the required value scenarios.

The following 'additional' valuation premises or information are required and are to be included in the addenda of your appraisal report (See attachments):

(1) Insurable Value Worksheet - Insurable Value

(2) Environmental Checklist

Additional Instructions: When completed, please upload an electronic copy of your report in PDF format to the East West Bank's YouConnect system.

**Report Addressee(s):**

East West Bank

Mr. Ernie Lopez

SVP, Chief Appraiser

228 W. Garvey Ave.

Monterey Park, CA 91754

Email: Ernesto.Lopez@eastwestbank.com

If the loan is for SBA purposes, the Bank and the SBA must appear as the client and the intended user of the appraisal report. Additionally, for certain SBA loans, the Certified Development Company (CDC), Bank and the SBA must be identified as the client and/or the intended user of the appraisal report.

**Delivery Instructions:**

Upon completion, please upload a complete signed copy of the report, with photographs, maps, and other exhibits. This report must be uploaded only into the YouConnect system.

**Addenda Requirements:**

Certification/license and qualifications. The following items must be included in the Report addenda:

(1) Qualifications of signatory appraisers

(2) Copy of valid certification/license for all signatory appraisers. At a minimum, at least one of the signatory appraisers must have a valid certification/license in the state in which the property is located.

**East West Bank's Appraisal Report Scope of Work**

It is incumbent upon you to present sufficient data and analysis so that your report meets EWB internal appraisal standards (as outlined below), FIRREA, and USPAP. The following 'recommended guidelines' are presented to assist you.

Additional East West Bank requirements for all Commercial Appraisal (In summary or narrative format) Report Assignments:

**(A.) Sales Comparison Approach:** must contain a minimum of five closed sale comparables. You may include active listings to inform the reader of the current conditions concerning this type of property. The sales must indicate current research of this type of improvement and be located in the same market area, as available. Cash equivalency must also be considered when applicable. All sales must be confirmed (provide name, phone number and

date), compared to the subject property, and analyzed in the report. Explain any adjustments including, but not limited to: property rights conveyed, terms of sale, condition of sale, market conditions (time), location and physical characteristics. Include a grid that summarizes the adjustment process and leads the reader to logical value conclusion. A net adjusted unit value must be quantitative reported. Location maps and photographs are required. **For subdivision properties, we prefer four land sales and eight (or more) home sales in establishing aggregate-retail proceeds.**

**(B.) <u>The Income Capitalization Approach:</u>** must consider the terms and conditions of the lease(s). Base projections of future rent and expenses on reasonably clear and appropriate evidence. This guide requires the appraiser, in developing income and expense statements and cash flow projections, to weigh historical information and trends, current market factors affecting such trends and anticipated events such as competition from developments under construction. A detailed abstract for all leases in existence for the subject property must be included along with a summary of the leases (rent roll) or if unavailable to obtain lease contracts an extraordinary assumption is required. The summary should include at least the following: leased area, commencement date, expiration date, term, face rates, concessions, effective rates, expense stops, CAM charges, expenses paid by lessor, etc. Any leasing commissions, T.I.s, etc., must be also considered.

Rental comparables that contain current revenue, expense, and vacancy data must be provided. Specific rent concessions, tenant improvements allowances, and leasing commissions should be provided. **A minimum of five rent comparables are required.**

Actual expenses for the property must be reported, summarized, and analyzed in the body of the Income Capitalization Approach. If the appraiser is unable to obtain the information, a statement to that effect is required; including the related impact on value (if any).

**The undersigned should be notified when this is the case prior to completion of the report.**

In addition, the appraiser must analyze and report appropriate deductions and discounts for any proposed construction, or any completed properties that are partially leased or leased at other than market rents as of the date of the appraisal, or any tract developments with unsold units.

Projected expenses must be realistic. Annual adjustments to expenses must be explained and market supported.  Please provide statistical evidence and compared to similar expense comparables or published expense comparable data sources.

All overall capitalization rates, discount rates, terminal capitalization rates, and equity yield rates are to be supported and explained.

A discounted cash flow analysis (EXCEL FORMAT) is required for all multi-tenant, income-producing properties as well as residential subdivision sellouts. A clear presentation of all assumptions employed in the analysis must be presented in the report.

Also, evidence that the proposed improvements can be completed by the effective date of the appraisal is important. Support for estimated income and expense at the time of completion of proposed improvements and during the rent-up or sell-out requires the incorporation of sufficient market research in the appraisal and the consideration of existing and future competition. It is appropriate to study comparable projects for evidence of construction periods, development costs, income and expense levels, and absorption. Items such as rental concessions, commissions, tenant finish allowances, add-on factors, and expense pass-throughs, must be studied to estimate realistic income expectancy.

**(C.) <u>The Cost Approach:</u>** This is required for all proposed projects and should give clear and concise estimate of the cost of all improvements. The source is to be reported. For Marshall and Swift, this would refer to Section, Page...etc.  All figures should be market supported and not based on the appraiser's "past experience". Please provide an Insurable Value, as requested by us, even though you may determine that the Cost Approach is not relevant (for improved properties). Cost data provided by the developer shall be compared to comparable market cost data and/ or a reliable published cost data source.

**Reconciliation And Final Value Estimate** - The purpose of reconciliation is to correlate the value indications from each approach to a final value conclusion, bearing in mind the definitions of value and the purpose and intended use of the report.

**<u>Valuation Methods:</u>** You are to follow a reasonable valuation method that addresses the direct sales comparison, income, and cost approaches to market value and explain how each approach was used. In addition, if an approach is not used, then explain why it was not applicable.

**<u>Subject's Sales and Listing History:</u>** Report and analyze any prior sales of the property (residential or commercial ) being appraised for the three (3) years preceding the effective date of the appraisal.

**<u>Sale Prospects:</u>** Report and analyze the expected exposure and marketing period for the property.

**Property Description:** Include the legal description and the property description required by USPAP. For all residential mixed-use properties East West Bank requires square footage for each component, residential and commercial portion. Additionally, when available, include a photograph of the subject's physical address signage

**Other Assets:** Identify and separately value any personal property, fixtures, or intangible items that are not considered real property but are included in the Commercial Appraisal (In summary or narrative format) report. Also, discuss the impact of their inclusion or exclusion on the estimate of market value.

**Unavailable Information:** If any requested, necessary or pertinent information that was needed to complete the appraisal was unavailable, you must disclose and explain why the information was unavailable.

**Supporting Documentation:** Include all relevant supporting documentation with all pertinent information reported so that your logic, reasoning, judgment, and analysis in determining the reported market value/s are evident to the Bank. If available, please include supportable documents related to any extraordinary assumptions discussed in the appraisal.

**Certification:** In addition to the required USPAP certification include an additional statement that this appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of the loan.

### ADDITIONAL SCOPE OF WORK REQUIREMENTS FOR INCOME PRODUCING PROPERTIES

**Financial Analysis:** Report and analyze data regarding current revenues, expenses, and property vacancies.

**Market Conditions and Trends:** Report and analyze current market conditions and trends that are expected to affect projected income and/or the absorption period of the subject property.

**Demand and Supply Considerations:** The supply of, and economic demand for, as well as vacancy, and absorption rates of properties competitive with the subject property in the relevant market area. Please, also indicate if there is any new construction of like-kind buildings in progress or permitted (i.e. current and prospective inventory) in the subject's market area, and what effect they may have on overall rental rates in the market.

**Deductions and Discounts:** Report and analyze appropriate deductions and discounts (as of the date of the appraisal) for any proposed construction or any completed properties that are partially leased or leased at other than market rents or any tract developments with unsold units. Also, in addition to the "As Is" value, please provide the "As Stabilized" value if applicable.

**To be provided by Bank:** Title Policy, Operating Statements, Rent Roll, Lease Contract, Construction/Refurbishment budget or Cost Breakdown, or any item that you may think is relevant please request from the undersigned. If they are not to your satisfaction or are not sufficiently detailed, or if you are not provided with the above-mentioned documents, please contact the undersigned. Do not complete the report if you DO NOT have the pertinent documentation at hand until further direction from us on how to proceed.

**Confidentiality/Fiduciary Duty:** Do not provide the loan applicant, property owner or borrower with a copy of the report, draft copy, or information about the concluded appraisal value of the property. Only the client, East West Bank is entitled to receive information from you.

Your strict adherence to the aforementioned policies and guidelines are required. It is integral to being maintained as a fee panel member. By executing this agreement you acknowledge compliance with the above terms of this contract.

**Important Items to be Returned**

• A signed copy of this engagement letter must be included in your report submission.

---

**Your signature on a copy of this letter will confirm our mutual understanding of the assignment, and that you have read and understand the Appraisal Policies and Procedures for East West Bank and agree to abide by them when performing this assignment.**

EAST WEST BANK

Further, your signature verifies that you will comply with the laws of the state in which the subject property(ies) is(are) located pertaining to real estate appraiser licensing/certification and the performance of real estate appraisal services.

In addition, your signature confirms that you understand and will abide by the requirements of the Gramm-Leach-Bliley Financial Services Act (the "GLB Act") (15 USC 6809) and its implementing regulations (12 CFR 40.3(n), 12 CFR 216.3(n), 12 CFR 332.3(n) or 12 CFR 573.3(n), as appropriate). Our concern is the confidential nature of any customer information provided to you.

Signature: _____        Date: _____

License or
Certificate No. _____        Expiration Date: _____

# *EXHIBIT E*

### *Qualifications of the Appraiser*

# QUALIFICATIONS OF JOHN OLIVAS, MAI
### jolivas@acore-realestate.com

Mr. Olivas is a Principal in the appraisal firm of A-CORE CONSULTANTS, INC. His experience includes portfolio valuations, feasibility studies, eminent domain, due diligence, evaluation, validations, review, full narrative reports, and limited scope reports.

Mr. Olivas has performed valuation analyses of properties, such as commercial, industrial, retail, restaurants, hospitality, residential, student housing and health facilities. In addition, he has appraised other properties, such as golf courses, vacant land, and special purpose property.

Mr. Olivas has performed income property valuation throughout the continental United States, Hawaii, Latin America, and Pacific Rim.

**Previous Experience**

Prior to forming A-CORE CONSULTANTS, INC., Mr. Olivas was a Senior Manager in the Real Estate Valuation Services Group in the Los Angeles Office of Ernst & Young. Prior to joining Ernst & Young, Mr. Olivas was Senior Appraisal Specialist for Bank of America where he engaged and reviewed appraisal assignments of internal production staff and independent firms. Additionally, he managed and coordinated internal appraisal projects. Mr. Olivas has also testified in US Bankruptcy Court.

**Education**

- B.S., Real Estate, University of Southern California, Los Angeles

- Real Estate Appraisal Courses: Appraisal Institute

- Current Seminars

**Professional Affiliations**

- Member of Appraisal Institute
- Certified General State Appraiser - California #AG015884
- Certified General State Appraiser – Arizona #31760
- Certified General State Appraiser – Nevada #A.0205930-CG
- Certified General State Appraiser – Texas#TX1380311 G
- Certified General State Appraiser – New York #46000050685
- Certified General State Appraiser – New Jersey #42RG00244000
- Certified General State Appraiser – Colorado #100050633
- Certified General State Appraiser – Oregon #C001401
- Certified General State Appraiser – Washington #20108503
- California Real Estate Broker License #01256385

The following is a sample of assignments completed by Mr. Olivas:

**Office Buildings**

- Proposed 199 Fremont Tower, San Francisco, California
- State Bar Building, San Francisco, California
- Crown Plaza, Sacramento, California
- Bay Medical Plaza, Chula Vista, California
- 650 Sierra Madre Villa, Pasadena, California
- 3 Hutton Centre, Santa Ana, California

# QUALIFICATIONS OF JOHN OLIVAS, MAI

### jolivas@acore-realestate.com

- 2001 Wilshire Boulevard, Santa Monica, California
- N/E/C Sunwest Court/Hospitality Lane, San Bernardino, California

**Retail Centers**

- El Monte Center, Elmonte, California
- 811 University Retail, Berkeley, California
- Malibu Creek Plaza, Malibu, California
- 960-970 Monument Street, Pacific Palisades, California
- 600 E. Colorado Boulevard, Pasadena, California
- 851 West Foothill, Rancho Cucamonga, California
- Village West Center, Hemet, California

**Industrial/Business Parks**

- Sacramento Bee Publishing Facility, Sacramento, California
- Press Enterprise Building, Riverside, California
- Modesto Bee Publishing Facility, Modesto, California
- Fresno Bee, Fresno, California
- Highland Business Park, Highland Park, California
- Silgan Industrial Building, Richmond, Indiana
- 2405-2465 Industrial Park, Phoenix, Arizona
- Greg Street Commerce Center, Sparks, Nevada ☐        1124 Olympic Drive, Corona, California
- 75-121 Mediterranean, Palm Desert, California
- S/E/C Devore Freeway/Airport, Ontario, California
- S/W/C Airport/Wineville, Ontario, California

**Hospitality**

- Clarion Hollywood Roosevelt Hotel, Hollywood, California
- Warner Center Marriott, Woodland Hills, California
- Embassy Suites, Arcadia, California
- Royal Dunes Resort, Hilton Head Island, South Carolina
- Embassy Vacation Resort, Orlando, Florida
- Four Seasons Hotel, Los Angeles, California
- Holiday Inn, Phoenix, Arizona
- Holiday Inn, Tempe, Arizona
- Coast Hotels and Casinos, Las Vegas, NV
- Proposed Ritz Carlton, Santa Barbara, CA

**Apartments**

- Bay Landing Apartments, Walnut Creek, California
- Oak Crest, Thousand Oaks, California
- Anaheim Village, Anaheim, California
- Emerald Pointe, Diamond Bar, California
- 1140 Winchester Avenue, Glendale, California
- Los Palmas Apartments, La Puente, California
- Playa Del Rey Apartment Complex, Playa Del Rey, California
- Victoria Woods, San Bernardino, California

## QUALIFICATIONS OF JOHN OLIVAS, MAI
### jolivas@acore-realestate.com

**Special Purpose**

- KCAL-9, Hollywood, California
- Radio Tower, Los Angeles, California
- Senior Apartments, Burbank, California
- Assisted Living, Tarzana, California

**Vacant Land**

- Bishop Ranch, San Ramon, California
- Walnut, California
- Hollywood, California
- Dermody Properties, Reno, Nevada

**Subdivisions**

- Pine & Ohio, San Bernardino, California ☐       Iverson/La Quila, Chatsworth, California
- Cambridge Chaparral, Lancaster, California
- Haskell Canyon, Santa Clarita, CA
- Malibu View Estates, Malibu, CA
- Robbers Peak, Anaheim Hills, CA
- Dictionary Hill, San Diego, CA
- Crystal Canyon, Reno, Nevada
- Crystal Ranch, Palmdale, California
- Bravo, Palmdale, California
- Heritage Sunrise, Palmdale, California

**Research Development**

- Oak Crest Drive, Westlake Village, California
- 2031 Mariposa, El Segundo, California

**Market/Feasibility Studies**

- Oak Creek Apartments, Folsom, California
- Peninsula Center, Rolling Hills Estate, California

**Mobile Home Parks**

- Pueblo Del Sol, Las Vegas, Nevada

**Restaurants**

- Carrows Restaurant, Norwalk, California

**Manufacturing**

- Silgan Containers, Lyons, New York
- Silgan Containers, Evansville, Indiana ☐       Silgan Containers, Richmond, Indiana
- Silgan Containers, Hoapstown, Illinois
- Silgan Containers, Coloma, Michigan

Business, Consumer Services & Housing Agency

# BUREAU OF REAL ESTATE APPRAISERS
## REAL ESTATE APPRAISER LICENSE

**John Olivas**

has successfully met the requirements for a license as a residential and commercial real estate appraiser in the State of California and is, therefore, entitled to use the title:

"Certified General Real Estate Appraiser"

This license has been issued in accordance with the provisions of the Real Estate Appraisers' Licensing and Certification Law.

BREA APPRAISER IDENTIFICATION NUMBER:    AG 015884

Effective Date:      December 5, 2021
Date Expires:        December 4, 2023

*Loretta Dillon*
Loretta Dillon, Deputy Bureau Chief, BREA

3060599

THIS DOCUMENT CONTAINS A TRUE WATERMARK – HOLD UP TO LIGHT TO SEE "CHAIN LINK"

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
Lesnick Prince & Pappas LLP, 315 W. Ninth St., Suite 705, Los Angeles, CA 90015

A true and correct copy of the foregoing document entitled (*specify*): **DECLARATION OF KEVIN J. CHEN IN SUPPORT OF DEBTOR'S FIRST-DAY MOTIONS** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) 05/30/2023, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Marcus Colabianchi**    mcolabianchi@duanemorris.com
- **Matthew A Lesnick**    matt@lesnickprince.com, matt@ecf.inforuptcy.com;jmack@lesnickprince.com
- **Noreen A Madoyan**    Noreen.Madoyan@usdoj.gov
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) _____, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) _____, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 05/30/2023 | Janet A. Mack | /s/ Janet A. Mack |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                                                                    **F 9013-3.1.PROOF.SERVICE**